# United States Tax Court

T.C. Memo. 2023-100

THOMAS D. CONRAD AND MARGARET JOAN CONRAD,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 7692-13.                              Filed August 7, 2023.

————

Thomas D. Conrad, pro se.

*Courtney S. Bacon*, for respondent.

## TABLE OF CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION ..................... 4

FINDINGS OF FACT ...................................................................... 6

I.    FMC ownership; FMC's management of hedge fund; FMC's
      use of the Conrads' condominium and house; FMC's yacht;
      FMC's airplane ..................................................................... 7

II.   Tax reporting ....................................................................... 12

      A.   2008 returns ................................................................ 12

           1.   FMC's 2008 tax return ......................................... 12

           2.   The Conrads' 2008 tax return .............................. 14

      B.   2009 returns ................................................................ 15

           1.   FMC's 2009 tax return ......................................... 15

**[*2]**    2.    The Conrads' 2009 tax return ......................................... 17

III.  Notice of deficiency and determination of accuracy-related
      penalties under section 6662(a) ........................................ 19

      A.    Audit and penalty approval form ........................................... 19

      B.    Notice of deficiency .............................................. 20

            1.    2008 .............................................. 20

            2.    2009 .............................................. 22

IV.  Trial proceedings ................................................. 24

OPINION ............................................................... 26

I.    It is unnecessary to determine who has the burden of proof
      regarding deficiencies. ................................................. 27

II.   FMC cannot deduct depreciation for its yacht and its airplane
      but can deduct expenses for storage, maintenance, and
      upkeep of both and for the costs of Dr. Conrad's flying
      lessons. ............................................................. 27

      A.    We sustain the disallowance of depreciation deductions
            FMC claimed for its yacht. ........................................ 28

      B.    The expenses for the storage, maintenance, and upkeep
            of FMC's yacht are deductible. ................................... 28

      C.    FMC cannot deduct depreciation for its airplane. ................. 38

      D.    FMC can deduct expenses for the storage, maintenance,
            and upkeep of its airplane, as well as the cost of Dr.
            Conrad's flying lessons. ......................................... 41

      E.    A summary of the allowed deductions related to the
            yacht and airplane for 2008 and 2009 ............................. 44

III.  For both 2008 and 2009 the Conrads can deduct portions of
      the expenses related to their residences. ............................. 44

      A.    2008 .............................................................. 56

3

**[\*3]**    1.   The Conrads' 2008 tax return .......................................... 58

          2.   The notice of deficiency ................................................. 59

          3.   The IRS's primary litigating position ............................ 60

          4.   The IRS's alternative litigating position ........................ 61

          5.   The Court's conclusion .................................................. 61

    B.   2009 ....................................................................................... 66

          1.   The Conrads' 2009 rental income from FMC ................. 68

          2.   Residence deductions ..................................................... 68

              a.   The Conrads' 2009 tax return ................................ 69

              b.   The notice of deficiency ......................................... 71

              c.   The IRS's primary and alternative litigating positions ................................................................. 72

              d.   The Court's conclusion ........................................... 72

IV.  The interest deduction claimed on Mrs. Conrad's 2009 Schedule C is deductible for FMC, not Mrs. Conrad ..................... 77

V.   The Conrads' liability for section 6662 accuracy-related penalties for the years at issue ................................................... 78

    A.   The IRS bears the burden of production, and Dr. Conrad bears the burden of persuasion. ............................................ 80

    B.   The requirements of section 6751(b)(1) are met for a substantial understatement but not for negligence. ............. 81

          1.   Substantial Understatement ......................................... 81

          2.   Negligence ..................................................................... 82

    C.   The Conrads are liable for penalties for substantial understatements if the parties' Rule 155 computations show that the Conrads substantially understated their tax liabilities for 2008 and 2009 (but no penalty is imposed on the portions of the underpayments

**[*4]**     attributable to the deductions claimed for depreciation of the yacht and the airplane because these portions are attributable to reasonable cause and good faith). ................. 84

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, *Judge*: Respondent (who we refer to as the IRS) issued a notice of deficiency to petitioners, Thomas D. Conrad (Dr. Conrad)[1] and Margaret Joan Conrad (Mrs. Conrad), for 2008 and 2009, the tax years at issue. The IRS determined tax deficiencies of $134,250 for 2008 and $73,132 for 2009 and accuracy-related penalties under section 6662(a)[2] of $26,850 for 2008 and $14,626 for 2009. The Conrads timely filed a Petition for redetermination under section 6213(a). We have jurisdiction under section 6214(a).[3]

The parties have resolved some issues through concessions.[4] The remaining issues and our holdings are summarized below.

1. *FMC's deductions related to its yacht and its airplane.* The Conrads were 51.25% owners of Financial Management Corporation (FMC), a

---

[1] Dr. Conrad has a Ph.D. in business.

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded to the nearest dollar.

[3] Section 7482(b) governs the venue for appeal from a decision of this Court. In general, if a petitioner is an individual taxpayer, the appellate venue is the circuit in which the petitioner resided when the petition was filed. § 7482(b)(1)(A). If, however, the petitioner does not reside within the United States at the time the petition is filed, the appellate venue will be the U.S. Court of Appeals for the D.C. Circuit unless the parties agree to one of the other circuit courts (except for the U.S. Court of Appeals for the Federal Circuit). § 7482(b)(1) (flush language). The parties stipulated that the Conrads resided in Panama when they filed their Petition on April 5, 2013. An appeal of the decision in this case would thus go to the D.C. Circuit unless the parties agreed to one of the other regional circuits. *See* § 7482(a) and (b)(1) (flush language) and (2); 28 U.S.C. § 1294.

[4] The Conrads concede that they failed to report (1) a $262,489 taxable distribution from an IRA for 2008 and (2) $5,520 and $1,535 of rental income for 2008 and 2009, respectively. These conceded rental income amounts are unrelated to the Conrads' renting of portions of their residences during 2008 and 2009 (which remains at issue in this case). The IRS concedes that the Conrads (1) did not receive $6 of royalty income in 2009 and (2) substantiated $3,330 of rental expenses related to the 2008 rental income that they failed to report.

[*5] subchapter S corporation. FMC owned a yacht and an airplane during the years at issue. On its Forms 1120S, U.S. Income Tax Return for an S Corporation, FMC deducted depreciation for the yacht and the airplane in the total amounts of $959,265 (for 2008) and $281,347 (for 2009). We sustain the IRS's disallowance of the depreciation deductions. FMC also deducted nondepreciation expenses for the yacht and the airplane. For 2008 FMC deducted $256,934 for the storage, maintenance, and upkeep of the yacht and the airplane (an amount that also included the cost of training Dr. Conrad to fly the airplane). For 2009 FMC deducted $21,893 for the storage, maintenance, and upkeep of the yacht and the airplane. We allow these nondepreciation deductions.

2. *The Conrads' deductions related to the rental use of their homes.* In addition to being 51.25% shareholders in FMC, during the years at issue Dr. Conrad provided management services to FMC, and in 2009 Mrs. Conrad provided accounting services to FMC. Both Dr. Conrad and Mrs. Conrad provided their services as independent contractors. During the years at issue the Conrads rented portions of their residences, a condominium in Florida from 2008 until July 2009 and a house in Georgia for the remainder of 2009, to FMC. On Dr. Conrad's Schedule C, Profit or Loss From Business, attached to their tax return for 2008, the Conrads deducted $222,207 for the business use of the condominium. On Dr. Conrad's 2009 Schedule C the Conrads deducted $288,000 for the business use of the condominium and the house. On Mrs. Conrad's 2009 Schedule C the Conrads deducted $48,542 for total condominium fees and $43,200 for total rent paid for the house. The notice of deficiency determined that in 2008 the condominium was not Dr. Conrad's principal place of business and consequently disallowed the $222,207 deduction for the expenses of the business use of the condominium. On the other hand, the notice of deficiency allowed an $18,443 deduction from Schedule E, Supplemental Income and Loss (a deduction the Conrads had not claimed on that schedule), for renting the condominium to FMC. The notice of deficiency determined that in 2009 neither the condominium nor the house was Dr. Conrad's principal place of business and consequently disallowed the $288,000 deduction for the expenses of the business use of these residences. The notice of deficiency also determined that the condominium fees and rent for the house were not ordinary and necessary expenses of Mrs. Conrad's accounting business and consequently disallowed the $48,542 deduction for condominium fees and the $43,200 deduction for rent. However, the notice of deficiency allowed a $3,885 Schedule C

[*6] deduction for Mrs. Conrad's use of the condominium and the house for her accounting business. The IRS also argues that the Conrads failed to report the $104,333 of rental income received from FMC in 2009. For 2008 we hold that the Conrads are entitled to (1) $184,010 of mortgage interest as an itemized deduction and (2) $144,000 of their mortgage interest as a rental-property deduction. For 2009 we hold that the Conrads are entitled to (1) $61,983 of mortgage interest and real estate taxes as itemized deductions; (2) $100,448 of their residence expenses as rental-property deductions; and (3) $3,885 of their residence expenses as a business-use-of-home deduction on Mrs. Conrad's Schedule C (consistent with the concession in the notice of deficiency). We further hold that the Conrads reported the $104,333 of rental income from FMC on their 2009 return.

3. *Interest expenses incurred on debt related to FMC's yacht.* On Mrs. Conrad's Schedule C for 2009 the Conrads deducted $7,582 of interest related to FMC's yacht. We hold that the $7,582 is deductible for FMC at the S corporation level.[5] As the Conrads are 51.25% owners of FMC, their share of the $7,582 interest deduction is $3,886.

4. *Accuracy-related penalties.* The notice of deficiency determined that the Conrads were liable for accuracy-related penalties under section 6662(a) for the years at issue. We hold that the Conrads are liable for an accuracy-related penalty on a portion of their underpayment for 2008 and a portion of their underpayment for 2009 if the parties' Rule 155 computations show that the Conrads substantially understated their income tax liabilities for the years at issue. In any event, the Conrads are not liable for any penalties as to the portions of the underpayments attributable to depreciation deductions for the yacht and the airplane. For those portions the Conrads had reasonable cause and acted in good faith.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The Stipulation of Facts and the Supplemental Stipulation of Facts (hereinafter Supplemental Stipulation) are incorporated herein by reference.

---

[5] Had FMC claimed the interest deduction originally, it would have been claimed on its 2009 Form 1120S.

**[\*7]** I. *FMC ownership; FMC's management of hedge fund; FMC's use of the Conrads' condominium and house; FMC's yacht; FMC's airplane*

Dr. Conrad and Mrs. Conrad collectively owned 51.25% of FMC, a subchapter S corporation during both years at issue.[6] FMC was the general partner and general manager of World Opportunity Master Fund (WOMF), a hedge fund that managed investments through its 15 managers who were located in the United States and six other countries. For its services to WOMF, FMC received annual compensation equal to 2% of WOMF's total assets. Dr. Conrad was the president of FMC and made executive decisions on its behalf, such as the hiring and firing of WOMF's managers. Dr. Conrad contends that he was an independent contractor of FMC rather than an employee.[7] In its notice of deficiency,[8] Answer to the Conrads' Petition, and posttrial briefs, the IRS does not contend that Dr. Conrad was an employee of FMC rather than an independent contractor. Accordingly, we find that Dr. Conrad was not an employee of FMC.

Dr. Conrad organized FMC in 1961 and has worked for FMC on and off since that time. In 2003 the Conrads took out a mortgage to buy a 17-room, 7,500 square foot condominium in Florida. The Conrads lived in the condominium and rented a portion of the condominium to FMC for FMC's office use. FMC paid the Conrads rent for use of this space. However, this space was never exclusively used by FMC. The Conrads' extended family would occasionally visit the Conrads at the

---

[6] We need not determine who owned the remaining 48.75% of FMC during 2008 and 2009 because the identities of the other shareholders do not affect our resolution of this case.

[7] This assertion is consistent with the way that the Conrads and FMC reported Dr. Conrad's compensation from FMC during the years at issue, i.e., (1) FMC issued Forms 1099–MISC, Miscellaneous Income, to Dr. Conrad instead of Forms W–2, Wage and Tax Statement; (2) FMC did not withhold income tax or employee FICA tax from its payments to Dr. Conrad, nor did it pay employer FICA tax to the IRS for its compensation payments to him; and (3) Dr. Conrad reported those payments as compensation on his Schedules C.

[8] In the notice of deficiency, the IRS disallowed deductions claimed on Dr. Conrad's Schedule C, the portion of a return on which a taxpayer reports independent contractor income, and the IRS determined an increase in Dr. Conrad's self-employment income corresponding to the amount of the disallowed deductions. Thus, the notice of deficiency implicitly treated Dr. Conrad as an independent contractor of FMC, not as an employee. *See* § 1402(c)(3) (defining trade or business for the purpose of computing self-employment income as excluding the performance of services as an employee). Nothing in the Answer claims that Dr. Conrad is an employee of FMC.

**[\*8]** condominium during the years at issue. While at the condominium, the extended family members made personal use of the rooms located in portions set aside for FMC's office use. The condominium was used in the manner described in this paragraph from its purchase in 2003 until its sale in June 2009.

In 2003 FMC bought a yacht. Its purpose for buying the yacht was to allow Dr. Conrad, on behalf of FMC, to travel up and down the East Coast of the United States to meet current and prospective clients of WOMF. The yacht was 65 feet long. It had three bedrooms, three bathrooms, an office, and a living area.

During the summer of 2003 the Conrads took a 71-day round trip on FMC's yacht (on behalf of FMC) between Florida and Maine, stopping at cities along the way to meet with current and prospective clients of WOMF. The guests engaged in such activities as steering, navigating, cleaning, and fueling the yacht because FMC did not hire a professional crew for these tasks. Over the 71-day trip, approximately 20 guests stayed overnight aboard the yacht. Each guest stayed on the yacht between three and ten nights. While on the yacht, Dr. Conrad met and entertained the guests. Dr. Conrad also used the onboard office every day of the trip for work as president of FMC. When the yacht returned to Florida at the end of the trip in the summer of 2003, FMC listed the yacht for sale. Neither FMC nor the Conrads ever used the yacht again.

For most of his life Dr. Conrad had used airplanes for traveling on distant business trips because of a condition which made it difficult for him to drive a car over long distances. For 40 years Dr. Conrad owned[9] and personally flew dozens of airplanes. He flew these airplanes primarily to solicit and acquire customers across the United States. Occasionally, Dr. Conrad would also lease these airplanes to third parties; the leases were particularly profitable for him in the 1990s.

In early 2008 FMC acquired an Eclipse airplane for approximately $1 million. Dr. Conrad intended to use the airplane in FMC's business by piloting it himself as he had done with his previous airplanes. He traveled to Albuquerque, New Mexico, to take possession of the airplane on FMC's behalf and to be trained to fly it. Dr. Conrad underwent a training program in Albuquerque to gain his license to fly

---

[9] Dr. Conrad testified that "of the last 40 years, [he] actually owned 27 airplanes." It is unclear whether Dr. Conrad meant that he personally owned these airplanes or that he owned the airplanes through companies he owned. We make no finding as to who owned the airplanes other than FMC's airplane.

[*9] the airplane but failed the program. Still determined to earn his license to pilot the airplane, Dr. Conrad had the airplane flown during the early summer of 2008 from Albuquerque to Florida, where the Conrads lived at the time. Dr. Conrad hoped to continue his training closer to home. However, shortly after returning to Florida around June 2008, Dr. Conrad traveled to Europe where he suffered the first of a series of three heart attacks. For 15 months Dr. Conrad was in such poor health that he was prevented from continuing flight training.

During 2008 FMC still owned the airplane and continued to incur expenses for its storage, maintenance, and upkeep. During 2008 FMC also incurred expenses for Dr. Conrad's flying lessons. FMC rented its airplane to third-party lessees during 2008 for their short-term use. The record does not reveal how much rent FMC received.

During 2008 FMC still owned the yacht and continued to incur expenses for its storage, maintenance, and upkeep.

During 2008 FMC paid Dr. Conrad $222,207 for his management services as president of FMC.

In 2008 the Conrads rented a portion of the condominium to FMC for FMC's office use.[10] FMC paid the Conrads $144,000 of rent in 2008. FMC's payment for rent was in addition to the $222,207 that FMC paid Dr. Conrad for his management services as president of FMC.

---

[10] Dr. Conrad offered into evidence what appears to be a drawing that purportedly shows the individual rooms within the condominium. The drawing is similar to a floor plan in that it shows each individual room within the house (e.g., "master bedroom", "master bathroom", etc.). In the margins next to the drawing, Dr. Conrad wrote that the condominium's total area was 7,500 square feet. However, the drawing does not provide any information allowing us to calculate the square footage of each room. On the drawing, Dr. Conrad shaded 13 of the rooms that were purportedly used by FMC and left unshaded 4 rooms purportedly used solely by the Conrads for personal purposes. For tax purposes the Conrads divided their expenses that were claimed on Dr. Conrad's 2008 and 2009 Forms 8829, Expenses for Business Use of Your Home, relating to the condominium (e.g., mortgage interest, real estate taxes, utilities) evenly between their personal use of the condominium and FMC use. As will be discussed *infra* note 11, the Conrads used the same allocation method for expenses reported on Dr. Conrad's 2009 Form 8829 that they incurred relating to the house that they rented and used as their personal residence during the second half of 2009. For reasons discussed *infra* OPINION, Part III.A.5 and III.B.2.d, we accept the Conrads' allocation method for dividing the condominium expenses between their personal use and FMC use.

**[*10]** During 2008 the Conrads paid mortgage interest expenses related to the condominium of $328,010.

In July 2009 the Conrads moved out of the condominium and into a rental house in Georgia. As they had done with the condominium, the Conrads leased a portion of the house to FMC for FMC's office use.[11] The record does not reveal whether any of the Conrads' extended family used the rented portion of the house for personal purposes.

The Conrads received from FMC total rent of $104,333 in 2009, but the record does not reveal how much of this rent was for the use of the condominium and how much was for the use of the house. For reasons discussed *infra* note 44, we need not make a finding about such attributions.

The Conrads paid the following expenses for the condominium and the house in 2009:

---

[11] Dr. Conrad offered into evidence a floor plan of the house. It shows that the house had (1) a first floor, (2) a basement, (3) a covered porch, and (4) two garages. The total combined area of the first floor and basement was 8,495.6 square feet. Including the covered porch and the two garages, the floor plan shows that the total area of the house was 9,662.1 square feet. Dr. Conrad highlighted portions of the floor plan that purportedly show the areas that the Conrads rented to FMC. We are not able to calculate the exact total area of the house rented to FMC because the floor plan does not show all the measurements needed to complete the calculation. We note, however, that the highlighted portions appear to have been approximately half of the house. We need not determine the exact total area of the house that was rented to FMC. For tax purposes the Conrads allocated half of the house expenses that were reported on Dr. Conrad's 2009 Form 8829 to FMC use and the other half of the house expenses to their personal use. For reasons discussed *infra* OPINION, Part III.B.2.d, we accept the Conrads' allocation method for dividing the house expenses between their personal use and FMC use.

**[*11]**

| Type of expense | Related to house or condominium | Amount of expense |
|---|---|---|
| Mortgage interest | Condominium | $81,889 |
| Real estate taxes | Condominium | 42,076 |
| Condominium fees | Condominium | 24,271 |
| Rent | House | 43,200 |
| Insurance | Unknown | 3,526 |
| Utilities | Unknown | 7,510 |
| Other expenses | Unknown | 61,812 |

These last three expenses were attributable to the residences, but the record does not reveal which of these expenses are attributable to only the condominium, to only the house, or to both properties. For reasons discussed *infra* note 44, we need not make a finding about such attributions.

In 2009 Mrs. Conrad operated an accounting sole proprietorship. There is little detail in the record about her accounting business. Dr. Conrad credibly testified that Mrs. Conrad provided accounting services to FMC in 2009 as an independent contractor.

In 2009 FMC paid the Conrads (1) $104,333 of rent, (2) $183,667 for Dr. Conrad's management services as president of FMC, and (3) $81,267 for Mrs. Conrad's accounting services to FMC.

During 2009 FMC still owned the yacht and continued to incur expenses for its storage, maintenance, and upkeep. FMC did not sell the yacht until after 2009. The record does not reveal the year of the sale.

During 2009 FMC still owned its airplane and continued to incur expenses for its storage, maintenance, and upkeep. FMC also rented its airplane to third-party lessees during 2009 for their short-term use. The record does not reveal how much rent FMC received.

In January 2010 Dr. Conrad resumed his attempts to obtain his license to pilot FMC's airplane after recovering from the heart attacks

[*12] that he suffered beginning in June 2008; however, he again failed to obtain his license. This being his second failure, in 2010 Dr. Conrad abandoned his efforts to obtain a license to pilot the airplane himself. Few pilots were licensed to fly the airplane. As a result, it was impractical to have FMC regularly hire pilots to operate it. In 2010 FMC sold it.

## II.    *Tax reporting*

### A.    *2008 returns*

#### 1.    *FMC's 2008 tax return*

For 2008 FMC filed Form 1120S claiming $970,370 of depreciation deductions for all its assets. The parties have stipulated that of the $970,370 in total depreciation claimed by FMC, $959,265 related to the yacht and the airplane. The stipulation does not state how much of the $959,265 related to the yacht versus the airplane. We need not determine how much of the $959,265 relates to the yacht versus the airplane because we hold that for 2008 FMC is not entitled to deduct depreciation for either asset. *See infra* OPINION, Part II.A and II.C.

FMC's 2008 Form 1120S also deducted $761,576 on line 19, Other deductions. A statement included in the return, "TY 2008 Other Deductions Schedule," broke the $761,576 into various categories, including $78,017 for "marine expense" and $178,917 for "aviation expense." Paragraph 18 of the Supplemental Stipulation states that FMC "took" a deduction of $256,934 for storage, maintenance, and upkeep of both FMC's airplane and yacht. Arithmetically, $256,934 is the sum of $78,017 (the amount reported as "marine expense") and $178,917 (the amount reported as "aviation expense"). This equality implies that the $256,934 deduction referred to in paragraph 18 of the Supplemental Stipulation consists of $78,017 for the storage, maintenance, and upkeep of the yacht and $178,917 for the storage, maintenance, and upkeep of the airplane.

However, the IRS proposed a finding of fact in its opening brief that the $256,934 deduction referred to in paragraph 18 of the Supplemental Stipulation included the expenses of flying lessons. Dr. Conrad did not object to this proposed finding of fact. Furthermore, the proposition that the $256,934 deduction included the flying-lessons expense is consistent with Dr. Conrad's credible testimony that FMC deducted the flying-lessons expense on its Form 1120S for 2008. Although Dr. Conrad did not testify where on its return FMC reported

**[\*13]** the expense for flying lessons, it would make sense for that expense to have been included with the $256,934 deduction because one of the two components of the $256,934 deduction was "aviation expenses." It is therefore appropriate for us to recognize that the $256,934 amount referred to in paragraph 18 of the Supplemental Stipulation includes the expense for flying lessons even though that paragraph states that the amount comprises only the expenses of storage, maintenance, and upkeep of FMC's airplane and yacht. *See* Rule 91(e) (stating that the Court will permit a party to contradict a stipulation "if justice requires"). We therefore find that the $256,934 amount deducted by FMC comprises (1) the cost of storage, maintenance, and upkeep of FMC's yacht and airplane and (2) the cost of Dr. Conrad's flying lessons.

We cannot conclusively determine how much of the $256,934 deduction referred to in paragraph 18 of the Supplemental Stipulation was for flying lessons. We need not make this determination, for two reasons. First, we hold that the IRS has waived any argument that the storage, maintenance, and upkeep expenses of $256,934 for the yacht and the airplane (and flying lessons) were not incurred. *See infra* OPINION, Part II.B and II.D. Second, we hold that for 2008 the entire amount of $256,934 for the storage, maintenance, and upkeep of FMC's yacht and airplane (as well as for flying lessons) is deductible. *See id.*

On its 2008 Form 1120S, FMC deducted $1,197 as an interest expense on line 13. It is unclear from the return whether this amount is intended to correspond to an interest expense related to the yacht.[12] Also on its Form 1120S, FMC deducted $144,000 on line 11 as "Rents." This $144,000 payment is for FMC's renting of a portion of the Conrads' condominium.

Overall, FMC reported an "ordinary business loss" of $1,258,079 for 2008 on line 21 of its 2008 Form 1120S. The computation of this amount on the return included the $959,265 of depreciation deductions related to the yacht and the airplane and the $256,934 for the storage, maintenance, and upkeep of FMC's yacht and airplane (as well as for flying lessons).

---

[12] The deductibility of the $1,197 of interest is not at issue because the notice of deficiency did not disallow the $1,197 of interest deductions and because the Conrads do not contend in their Petition that FMC underreported its interest-expense deduction and that the correct amount of the deduction was greater than $1,197.

**[\*14]**          2.     *The Conrads' 2008 tax return*

For 2008 the Conrads filed a joint return. They did not report any wages or salaries on their Form 1040, U.S. Individual Income Tax Return, for compensation for Dr. Conrad's services as president of FMC. Nor did they claim unreimbursed employee business-expense deductions on their Schedule A, Itemized Deductions, for Dr. Conrad's role as president of FMC. The Conrads reported income of $222,207 on Dr. Conrad's 2008 Schedule C for his services as president of FMC.[13] They also reported rental income of $144,000 on their 2008 Schedule E for their renting of the condominium to FMC.

On their 2008 Schedule A the Conrads deducted home mortgage interest of $216,556. On Dr. Conrad's 2008 Schedule C the Conrads reported a deduction for the "business use of your home" of $222,207. The Form 8829 attached to Dr. Conrad's Schedule C shows that the $222,207 amount was computed as follows: (1) the Conrads reported that they paid $164,006 of mortgage interest on the condominium allocable to Dr. Conrad's sole proprietorship; (2) further condominium deductions from business use were limited to $58,201; (3) there was a $114,520 operating-expense carryforward from 2007 related to business use of residences; (4) the allowable corresponding deduction was $58,201; (5) further deductions for business use of the condominium were limited to zero; (6) the depreciation expense for business use of the condominium for 2008 was $72,724; (7) the carryforward of depreciation expense and excess casualty loss for business use from 2007 was $314,667; (8) there was an operating-expense carryforward to 2009 of $56,319; and (9) there was a carryforward of depreciation expense and excess casualty loss to 2009 of $387,391. Adding the $216,556 of mortgage interest reported on the Conrads' Schedule A and the $164,006 of mortgage interest reported on Dr. Conrad's Schedule C, the Conrads

---

[13] It is unclear where on the Form 1120S FMC deducted the $222,207 of compensation paid to Dr. Conrad for his management services. Line 7 of its Form 1120S, Compensation of officers, is blank. As mentioned *supra*, FMC deducted $761,576 on line 19, Other deductions. FMC's Form 1120S includes a TY 2008 Other Deductions Schedule that provides an itemization of these other deductions. Among the expenses making up the other deductions is "Professional Services" of $264,570. This is the only specific deduction claimed on FMC's return that is large enough to include the $222,207 of compensation paid to Dr. Conrad, whether on the TY 2008 Other Deductions Schedule or anywhere else on FMC's 2008 Form 1120S (aside from depreciation). It follows that if FMC deducted the $222,207 paid to Dr. Conrad, it likely did so on line 19, Other deductions.

**[\*15]** claimed a total mortgage interest deduction of $380,562 in 2008 despite having paid only $328,010.

On their 2008 Schedule E the Conrads deducted $644,816 for their 51.25% share of FMC's ordinary business loss of $1,258,079. This $644,816 includes the Conrads' proportional share of FMC's claimed depreciation deductions for the yacht and the airplane and of FMC's claimed deductions for storage, maintenance, and upkeep expenses related to the yacht and the airplane and for Dr. Conrad's flying lessons.[14] The Conrads did not claim any deductions on their 2008 Schedule E related to the renting of a portion of their condominium to FMC.

    B.    *2009 returns*

        1.    *FMC's 2009 tax return*

For tax year 2009 FMC filed Form 1120S claiming $290,340 of depreciation deductions for all its assets. The parties have stipulated that FMC claimed a $281,347 depreciation deduction for both the yacht and the airplane. The stipulation does not state how much of the $281,347 was for the yacht versus the airplane, nor can we determine from the record how much of the $281,347 deduction was for the yacht versus the airplane. As for 2008, however, we need not determine how much of this $281,347 relates to the yacht versus the airplane because we hold that for 2009 FMC is not entitled to deduct depreciation for either asset. *See infra* OPINION, Part II.A and II.C.

FMC's 2009 Form 1120S also deducted $400,091 on line 19, Other deductions. An attached statement gave an itemization of the "Other deductions." One such line item was a $21,893 deduction for "marine expense." Unlike the 2008 Form 1120S, it has no line item for "aviation expense." Although the word "marine" might suggest the category "marine expense" would not include expenses for an airplane, paragraph 24 of the Supplemental Stipulation states that the $21,893 deduction for "marine expense" relates to the expenses for both the yacht and the airplane. We need not determine how much of the $21,893 deduction was claimed to be related to the yacht versus the airplane because (1) the IRS does not dispute that the storage, maintenance, and upkeep

---

[14] For 2008 the Conrads' proportional share of FMC's depreciation deductions for its yacht and its airplane (as claimed) equals $491,662. For 2008 the Conrads' proportional share of FMC's nondepreciation deductions for its yacht and its airplane (as claimed) equals $131,689.

[*16] expenses of $21,893 for the yacht and airplane were incurred and (2) we hold that the entire $21,893 for the storage, maintenance, and upkeep of FMC's yacht and airplane is deductible.[15] *See infra* OPINION, Part II.B and II.D.

On its 2009 Form 1120S FMC did not deduct any interest expense. However, the parties stipulated that in 2009 "$7,582 [of] interest [was] paid relating to the yacht." This stipulation establishes two facts: first, that interest of $7,582 was actually paid, and second, that the interest was related to the yacht. The stipulation alone does not reveal who paid the interest and who was the borrower in the corresponding loan transaction (if different). Mrs. Conrad reported this interest expense on her 2009 Schedule C.

However, in its opening brief the IRS's proposed finding of fact paragraph 8 states that Dr. Conrad purchased the yacht "in his capacity as President of [FMC]," which, if true, means that FMC was the owner of the yacht. Dr. Conrad did not respond to this proposed fact in his brief, and we conclude that he thus admitted it is true. *See* Rule 151(e)(3). The IRS's proposed findings of fact paragraphs 13 and 14 state, respectively, that (1) the yacht was used only in 2003 and (2) the yacht was never used by FMC or the Conrads thereafter. Dr. Conrad did not respond to paragraph 13 and expressly stated that paragraph 14 is correct. Therefore, we conclude that Dr. Conrad agrees that neither he nor his wife used the yacht during 2009. *See* Rule 151(e)(3). Finally, the IRS's proposed finding of fact paragraph 52 states that the yacht interest is unrelated to Mrs. Conrad's accounting sole proprietorship. Dr. Conrad admitted in his brief that this is correct. We therefore conclude that Mrs. Conrad did not use the yacht in her accounting business during 2009. As we discuss more fully *infra* OPINION, Part IV, FMC was the borrower on the loan related to its yacht. We need not determine who paid the interest during 2009 because, for reasons discussed *infra* OPINION, Part IV, the identity of the payor does not affect our holdings in this case.

---

[15] Neither the stipulations nor the record explains why the storage, maintenance, and upkeep expenses for the yacht and the airplane were $235,041 less in 2009 than in 2008. This could relate, at least in part, to Dr. Conrad's inability to fly the airplane for 15 months during the second half of 2008 and 2009 (while he recovered from his heart attacks). In any event, we hold that the amounts paid or incurred by FMC for these expenses are not at issue because the IRS has waived any argument relating to the proper amounts of these expenses or whether they were paid or incurred by FMC in the relevant years.

[*17]  FMC also deducted $104,333 on line 11 of its 2009 Form 1120S as "Rents." This deduction is for its payment of $104,333 for rent to the Conrads for its use of portions of the Conrads' condominium and the house during 2009.

Overall, FMC claimed an "ordinary business loss" deduction of $544,327 for 2009 on line 21 of its Form 1120S. This amount included the $281,347 of depreciation deductions for both the yacht and the airplane and the $21,893 deduction for the storage, maintenance, and upkeep of the yacht and the airplane.

### 2.    *The Conrads' 2009 tax return*

For 2009 the Conrads filed a joint return. They did not report any wages or salaries on their Form 1040 or deduct unreimbursed employee business expenses on their Schedule A for Dr. Conrad's role as president of FMC or for Mrs. Conrad's accounting services to FMC. The Conrads reported income of $288,000 on Dr. Conrad's 2009 Schedule C ostensibly for his services as president of FMC and $81,267 on Mrs. Conrad's 2009 Schedule C for her accounting services to FMC as an independent contractor. Therefore, the Conrads reported on their return a combined total of $369,267 of income for their professional services to FMC. The Conrads did not report any rental income on their 2009 Schedule E even though FMC reported a $104,333 deduction for rent paid to the Conrads on its 2009 Form 1120S. In his posttrial brief, Dr. Conrad argues that, contrary to their return, the $369,267 consists of $104,333 of rents from FMC and $264,934 of compensation for professional services. Dr. Conrad's brief does not assert how much of the $264,934 is attributable to his management services versus Mrs. Conrad's accounting services. Whether the Conrads reported the $104,333 of rental income paid by FMC on their Form 1040 is a disputed issue in this case, which we discuss more fully *infra* OPINION, Part III.B.1. We hold that the Conrads did report the $104,333 of rental income but that they did so on Dr. Conrad's Schedule C as part of the $288,000 ostensibly reported as compensation for services.

On their 2009 Schedule A the Conrads deducted $81,889 for home mortgage interest and $21,038 for real estate taxes.

On Dr. Conrad's 2009 Schedule C the Conrads deducted $288,000 for the "business use of home." The Form 8829 attached to Dr. Conrad's Schedule C divides the $288,000 deduction into the following categories: (1) $40,944 of mortgage interest; (2) $21,038 of real estate taxes;

**[\*18]** (3) $1,763 of insurance expenses; (4) $3,755 of utilities expenses; (5) $30,906 of other expenses; (6) $56,319 of an operating-expense carryforward from 2008; and (7) $133,275 of depreciation and excess casualty loss expenses (consisting of $72,724 of depreciation for 2009 and $60,551 of depreciation and excess casualty loss expenses carried forward from 2008). Items (1), (2), (3), (4), and (5) were expressly computed on the Schedule C by using 50% to determine the portions of the expenses allocable to nonpersonal use. Adding the mortgage interest deductions claimed on both their Schedule A and Dr. Conrad's Schedule C, the Conrads claimed a total mortgage interest deduction of $122,833 for 2009 despite having paid only $81,889.

On Mrs. Conrad's 2009 Schedule C the Conrads claimed deductions for the following: (1) $7,582 of interest expenses related to FMC's yacht, (2) $48,542 of condominium fees for the condominium, and (3) $43,200 of rent for the house.

The $48,542 of condominium fees for the condominium was reported on Mrs. Conrad's Schedule C on the line for "[o]ffice expense." The parties have stipulated that the actual amount the Conrads paid for condominium fees was only $24,271.

The $43,200 of rent for the house was reported on Mrs. Conrad's Schedule C on the line for "[r]ent or lease" of "[v]ehicles, machinery, and equipment."

On their 2009 Schedule E the Conrads claimed a $278,989 deduction for their 51.25% share of FMC's ordinary business loss of $544,327. This $278,989 includes the Conrads' proportional shares of FMC's reported depreciation deductions for the yacht and the airplane and of FMC's reported deductions for storage, maintenance, and upkeep expenses related to FMC's yacht and airplane.[16] As for 2008, the Conrads did not deduct any expenses on their 2009 Schedule E related to the renting of portions of their residences to FMC.

---

[16] For 2009 the Conrads' proportional share of FMC's depreciation deductions for its yacht and its airplane (as claimed) equals $144,202. For 2009 the Conrads' proportional share of FMC's nondepreciation deductions for its yacht and its airplane (as claimed) equals $11,221.

[*19] III.    *Notice of deficiency and determination of accuracy-related penalties under section 6662(a)*

A.    *Audit and penalty approval form*

In 2011 the Conrads' 2008 and 2009 returns were audited by Revenue Agent Milton Finney. On April 12, 2011, Finney prepared a Civil Penalty Approval Form that covered both years at issue. The first page of the form had the standard preprinted heading "Reason(s) for Assertion of Penalty(s) IRM 4.10.6.7(1)." Underneath was a blank box in which Finney wrote two reasons for asserting a penalty. First, he wrote that "[t]axpayers failed to exercise ordinary and necessary care in the preparation of the return." Second, he wrote that "[t]he understatement of the tax is greater than $5,000.00." These reasons did not include citations of Code provisions.

On the second page of the Civil Penalty Approval Form is a table titled "Penalties Requiring Group Manager Approval." This table has several preprinted columns, of which those labeled "IRC," "Penalty," and "Assert Penalty" are relevant for this case. The "Assert Penalty" column asks the examining agent to mark either the "Yes" or the "No" box for various components of the accuracy-related penalties, which are identified by preprinted descriptions of each component in the "Penalty" column and by preprinted Code provisions in the "IRC" column. Finney marked the "Yes" box in the "Assert Penalty" column only for the component identified as "Substantial Understatement" in the "Penalty" column and "6662(d)" in the "IRC" column. Finney marked the "No" box in the "Assert Penalty" column for all other components, including the one identified as "Negligence" in the "Penalty" column and "6662(c)" in the "IRC" column.

On July 18, 2011, Janelle Marlow, Finney's supervisor, signed this Civil Penalty Approval Form. For reasons discussed *infra* OPINION, Part V.B, we conclude that Finney determined that the Conrads were liable for only the section 6662(a) penalty as to a substantial understatement of income tax, but not as to negligence. We also conclude that Marlow approved only the section 6662(a) penalty as to a substantial understatement of income tax, but not as to negligence.

Marlow credibly testified that she sent the Conrads an "initial report" with the Civil Penalty Approval Form attached. This initial report is not in the record, and the record does not allow us to determine the date that the initial report was sent to the Conrads. Because the

**[\*20]** initial report was attached to the Civil Penalty Approval Form, and because that form bears the date July 18, 2011 (i.e., the date of Marlow's signature on the form), we conclude that the initial report was sent to the Conrads on or after July 18, 2011.

On January 8, 2013, the IRS issued a notice of deficiency to the Conrads. It was signed by Alan Redstone, who is referred to in the notice of deficiency as an "Appeals Team Manager." The notice of deficiency named Marion S. Tate as the "Person to Contact." It did not provide any additional information on Redstone and Tate. We now describe the adjustments to income made in the notice of deficiency and the accuracy-related penalties determined by the notice of deficiency.

B.    *Notice of deficiency*

1.    *2008*

For 2008 the notice of deficiency made two adjustments to FMC's income. First, it disallowed the $959,265 deduction claimed on FMC's Form 1120S for the combined depreciation of both FMC's yacht and its airplane. The disallowance of the depreciation deductions was explained as follows:

> [I]t has been determined your present Accounting Method (of deducting Depreciation) does not clearly reflect expenses in accordance with IRC [section] 446 . . . . A change of Accounting Method is imposed pursuant to IRC [section] 446 . . . . In the "New Accounting Method" you will not be allowed to deduct Depreciation. Therefore Depreciation is increased $959,265.00 for your 200812 . . . .

Second, the notice of deficiency disallowed the $256,934 deduction claimed on FMC's Form 1120S for the total storage, maintenance, and upkeep expenses of both FMC's yacht and its airplane, as well as the expenses of Dr. Conrad's flying lessons. The disallowance of the nondepreciation deductions was explained as follows:

> [I]t has been determined your present Accounting Method (of deducting Other Deductions) does not clearly reflect expenses in accordance with IRC [section] 446 . . . . A change of Accounting Method is imposed pursuant to IRC [section] 446 . . . . In the "New Accounting Method" you will

**[*21]** not be allowed to deduct Other Deductions. Therefore
Other Deductions is increased $256,934.00 for your 200812
. . . .

The total amount of deductions disallowed from FMC's Form 1120S is $1,216,199. This is the sum of $959,265 and $256,934. The notice of deficiency reduced the Conrads' $644,816 deduction claimed on their Schedule E for their 51.25% proportional share of FMC's losses by $623,350, i.e., 51.25% of $1,216,199.

Next, the notice of deficiency disallowed the entire $222,207 deduction for the business use of the condominium claimed on Dr. Conrad's Schedule C. The notice of deficiency explained that "you [Dr. Conrad] failed to establish that the office was used exclusively on a regular basis as your principal place of business." Instead, the notice of deficiency determined that the Conrads were entitled to an $18,443 deduction on their Schedule E.[17] The notice of deficiency did not disallow the Conrads' $216,556 of mortgage interest claimed as an itemized deduction on their 2008 Schedule A. Neither did it adjust the $144,000 of rental income from FMC that the Conrads claimed on their Schedule E.

The notice of deficiency determined that the Conrads were liable for a section 6662(a) accuracy-related penalty of $26,850 because their underpayment for 2008 was due to (1) a substantial understatement of income tax, (2) a substantial valuation misstatement, or (3) negligence. As explained *infra* OPINION, p. 79, we conclude that the IRS has abandoned any argument that the Conrads are liable for a penalty due to a substantial valuation misstatement. Although the notice of deficiency bore the names of two employees of Appeals (i.e., Redstone and Tate), the employees likely assumed, like IRS counsel in this litigation, that the Civil Penalty Approval Form evinced Finney's determination to assert a penalty for both a substantial understatement of income tax and negligence. For reasons discussed *infra* OPINION, Part V.B.1 and V.B.2, we conclude that Finney determined that the

---

[17] In its opening brief the IRS proposed in finding of fact 47 that the notice of deficiency allowed the Conrads a Schedule E deduction "because [the Conrads] reported rental income from [FMC] . . . for [FMC's] use of their home for business." The IRS did not explain in the notice of deficiency or further explain in its briefs how it calculated $18,443 as the correct allowable deductions in 2008 or which expenses it included in this calculation.

**[\*22]** Conrads were liable for a penalty due only to a substantial understatement of income tax.

2. *2009*

For 2009 the notice of deficiency made two adjustments to FMC's income. First, it disallowed the $281,347 deduction claimed on FMC's Form 1120S for the combined depreciation of both FMC's yacht and its airplane. The disallowance of the depreciation deductions was explained as follows:

> [I]t has been determined your present Accounting Method (of deducting Depreciation) does not clearly reflect expenses in accordance with IRC [section] 446 . . . . A change of Accounting Method is imposed pursuant to IRC [section] 446 . . . . In the "New Accounting Method" you will not be allowed to deduct Depreciation. Therefore Depreciation is increased . . . $281,347.00 for your 200912.

Second, the notice of deficiency disallowed the $21,893 deduction claimed on FMC's Form 1120S for the combined storage, maintenance, and upkeep expenses of both FMC's yacht and its airplane. The disallowance of the nondepreciation deductions was explained as follows:

> [I]t has been determined your present Accounting Method (of deducting Other Deductions) does not clearly reflect expenses in accordance with IRC [section] 446 . . . . A change of Accounting Method is imposed pursuant to IRC [section] 446 . . . . In the "New Accounting Method" you will not be allowed to deduct Other Deductions. Therefore Other Deductions is increased . . . $21,893.00 for your 200912.

The total amount of deductions disallowed on FMC's Form 1120S is $303,240. This is the sum of $281,347 and $21,893. The notice of deficiency reduced the Conrads' $278,989 deduction claimed on their Schedule E for their 51.25% proportional share of FMC's losses by $155,422, i.e., 51.25% of $303,240.

Next, the notice of deficiency made four adjustments to the Conrads' income that were unrelated to the passthrough of FMC's income and deductions. First, the notice of deficiency disallowed the entire $288,000 deduction claimed on Dr. Conrad's Schedule C. Instead,

**[*23]** it determined that the Conrads were entitled to a $3,885 business-use-of-home deduction on Mrs. Conrad's Schedule C.[18] Second, it disallowed the $43,200 deduction for rental payments for the house claimed on Mrs. Conrad's Schedule C. Third, it disallowed the $48,542 deduction for condominium fees claimed on Mrs. Conrad's Schedule C. Fourth, it disallowed the $7,582 deduction for interest expenses related to FMC's yacht claimed on Mrs. Conrad's Schedule C.

The notice of deficiency determined that the Conrads were liable for an accuracy-related penalty of $14,626 under section 6662(a) because the Conrads' underpayment for 2009 was due to (1) a substantial understatement of income tax, (2) a substantial valuation misstatement, or (3) negligence. As explained *infra* OPINION, p. 79, we conclude that the IRS has abandoned any argument that the Conrads are liable for a penalty due to a substantial valuation misstatement. The notice of deficiency bore the names of two employees of Appeals (i.e., Redstone and Tate). However, the employees likely assumed, like IRS counsel in this litigation, that the Civil Penalty Approval Form evinced Finney's determination to assert a penalty for both a substantial understatement of income tax and negligence. For reasons discussed *infra* OPINION, Part V.B.1 and V.B.2, we conclude that Finney determined that the Conrads were liable for a penalty due only to a substantial understatement of income tax.

The Conrads timely filed their Petition with this Court on April 5, 2013, seeking redetermination of the deficiencies and penalties determined in the January 8, 2013, notice of deficiency. The parties have stipulated that the Conrads were residents of Panama when they filed their Petition. The IRS filed an Answer. The Answer did not further clarify the reasons for the disallowances of deductions FMC claimed on its 2008 and 2009 Forms 1120S or the disallowances of deductions the Conrads claimed on their 2008 and 2009 Forms 1040. The Answer did not state that IRS counsel had made an independent determination to assert the negligence component of the accuracy-related penalty.

---

[18] As with its adjustment for deductions for 2008, the notice of deficiency failed to explain how it calculated $3,885 as the correct allowable deduction on Mrs. Conrad's Schedule C or which expenses were included in this calculation. And the IRS did not attempt to give such an explanation in its briefs.

**[*24]** IV. *Trial proceedings*

The Court set a trial date of May 2, 2016. The order setting this case for trial required the parties to file pretrial memoranda, which, among other things, were to identify what issues were extant in the case.

The IRS's Pretrial Memorandum, which was filed on April 18, 2016, stated that the only issue in the case was the deductibility of the expenses related to the condominium and the house: "Petitioners and respondent's counsel have resolved all issues except for the disallowance of petitioners' Business Use of Home deduction for both years at issue." When the Court was convened on the day of trial, Dr. Conrad and IRS counsel lodged the Stipulation of Facts, the subject matter of which was limited to the condominium and house expenses. Dr. Conrad and IRS counsel advised the Court that they had thought they would be able to settle all other issues in the case before trial. However, they explained that they realized shortly before the start of trial they could not agree on the terms of the settlement.[19]

After this discussion of the failure of the parties' settlement negotiations, Dr. Conrad asked the Court if "we're just going to stop today?" The Court explained that the day had been appointed for trial and that the trial should proceed.

Dr. Conrad began testifying on direct about the issue of the expenses of the condominium and the house. After Dr. Conrad had finished testifying with respect to that issue and began testifying about the issues related to the yacht and the airplane, it became apparent that Dr. Conrad was unprepared for trial on these latter issues. The Court began to inquire of IRS counsel what the IRS's positions were on the issues related to the yacht and the airplane. IRS counsel explained that the yacht and airplane expenses had both been "disallowed in the notice of deficiency." The Court asked IRS counsel whether the Conrads had the burden of proof with respect to the expenses. IRS counsel said, "Yes." The Court asked whether that meant Dr. Conrad had to prove "in this trial his entitlement to the plane and yacht expenses"? IRS counsel responded: "Yes. And the business purpose for both a plane and yacht in the corporation [FMC]." The Court asked whether "one aspect of the deduction is that he [Dr. Conrad] has to prove that the corporation incurred the expense?" IRS counsel stated: "Yes. Incurred the expenses,

---

[19] Dr. Conrad and IRS counsel explained that no written settlement had ever been executed.

[*25] and then the other aspect is whether or not there was a real business purpose for having an airplane and a yacht."

When the Court turned to Dr. Conrad, it asked: "So Dr. Conrad, you understand that Ms. Bacon [IRS counsel] says you need to address these other issues, too, in order to prevail"? Dr. Conrad responded: "Yes, sir. But I apologize for not being prepared, because I thought we had that all taken care of." The Court then asked Dr. Conrad: "If you were to litigate these issues . . . would you need documents that you don't have here today?" Dr. Conrad responded: "I've got four large boxes that I can't even carry, lift, that have all these records in them . . . ." Dr. Conrad then asked for a continuance of the trial, so as to allow him additional time to, among other things, present the documents to IRS counsel for the purpose of engaging in further settlement negotiations. The Court, over the objection of the IRS, granted the continuance. The Court did not order additional pretrial memoranda from the parties in advance of the continued trial. Thus, when the continuation of trial came, the IRS had not filed a new pretrial memorandum in the case addressing the yacht and airplane issues.

At the start of the continued trial, the parties lodged the Supplemental Stipulation regarding both the depreciation and nondepreciation deductions related to FMC's airplane and yacht. Paragraph 17 of the Supplemental Stipulation stated that for 2008 FMC had deducted $959,265 of depreciation related to the yacht and the airplane. Paragraph 18 of the Supplemental Stipulation stated that for 2008 FMC had deducted $256,934 of nondepreciation expenses related to the yacht and the airplane. Paragraph 23 of the Supplemental Stipulation stated that for 2009 FMC had deducted $281,347 of depreciation related to the yacht and the airplane. Paragraph 24 of the Supplemental Stipulation stated that for 2009 FMC had deducted $21,893 of nondepreciation expenses related to the yacht and the airplane.

When the trial resumed, the parties did not make opening statements. Dr. Conrad testified on direct about the airplane, yacht, and residence expenses; he was then subject to examination by IRS counsel. During the testimony, the Court periodically asked IRS counsel about its position regarding the airplane and yacht deductions. As to the nondepreciation expenses related to the airplane, IRS counsel explained that the deductions were challenged because the airplane "was never used for business." The Court then asked: "Would you be contesting that the expenses were incurred?" IRS counsel responded:

**[\*26]**      No. No, the expenses were incurred. The Appeals officers looked through the documents and disallowed it just on the legal basis of the ordinary and necessary business assets, no depreciation, no ordinary and necessary but they were incurred.

The record is unclear as to whether IRS counsel's reference to "Appeals" meant IRS review (1) before the January 8, 2013, notice of deficiency or (2) between May 2, 2016, and the continued trial on September 13, 2016.

The Court also inquired as to the IRS's challenge to the deductibility of expenses related to the yacht. After discussing depreciation, IRS counsel addressed the nondepreciation expenses:

The disallowance of the expenses [is] that they're not—owning a yacht to visit 25 customers for 30 days is not an ordinary and necessary business expenses [sic], nor is the upkeep of that yacht for years to come in the Government's opinion.

IRS counsel also explained that the nondepreciation expenses were not deductible because of the section 274(a)(1)(B) limitations on deducting the expenses of an entertainment facility.

At the conclusion of the continued trial, the Court ordered the parties to file briefs. We extensively discuss the IRS's brief regarding the nondepreciation deductions related to the yacht *infra* OPINION, Part II.B. Our conclusions about these portions of the IRS's brief are that the brief (1) contends that the yacht is an entertainment facility, (2) relies on the factual allegation that the yacht was used for personal and entertainment purposes during the 2003 trip, (3) relies on the uncontested fact that during the years at issue, the yacht was in storage, and (4) does not directly argue that FMC failed to pay or incur the nondepreciation expenses claimed as deductions for the yacht. As discussed *infra* OPINION, Part II.B, we hold that the IRS has waived any argument that the nondepreciation expenses for the yacht were not paid or incurred by FMC.

## OPINION

Before we discuss the merits of this case, one procedural matter requires our attention. At trial, Mrs. Conrad did not appear, nor was there any appearance on her behalf. Dr. Conrad did make an appearance. The IRS made an oral motion to dismiss the case for lack of

**[\*27]** prosecution as to Mrs. Conrad, and this motion was taken under advisement to be acted upon at the time the merits of the case were decided. As Dr. Conrad had no authority to represent his wife, and there was no other appearance by her or on her behalf, the motion to dismiss will be granted, and a decision will be entered against Mrs. Conrad for deficiencies and penalties in the same amounts as those ultimately determined against Dr. Conrad.

I.      *It is unnecessary to determine who has the burden of proof regarding deficiencies.*

The taxpayer generally bears the burden of proof (and therefore must prove the relevant facts by the preponderance of the evidence), except when the conditions of section 7491(a) are satisfied. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Bronstein v. Commissioner*, 138 T.C. 382, 384 (2012). Some of our findings of fact relate to the deficiency amounts, while others relate to penalty liabilities. Our findings of fact regarding the deficiency amounts are based on the preponderance of the evidence. Thus, it is unnecessary to determine which party (i.e., the Conrads or the IRS) has the burden of proof as to the deficiency amounts. *See Estate of Bongard v. Commissioner*, 124 T.C. 95, 111 (2005).

We discuss the burden of proof regarding the Conrads' liabilities for the penalties separately. *See infra* OPINION, Part V.A.

II.     *FMC cannot deduct depreciation for its yacht and its airplane but can deduct expenses for storage, maintenance, and upkeep of both and for the costs of Dr. Conrad's flying lessons.*

On its 2008 Form 1120S, FMC claimed $959,265 of depreciation deductions for both its yacht and its airplane and $256,934 of deductions for storage, maintenance, and upkeep expenses for both its yacht and its airplane.[20] The $256,934 of nondepreciation deductions also includes expenses paid for Dr. Conrad's flying lessons. The notice of deficiency disallowed all these deductions, resulting in a total disallowance of $1,216,199. We disallow the depreciation deductions claimed for 2008

---

[20] As the Conrads were 51.25% owners of FMC, their share of these claimed deductions was $623,350, which was incorporated into the $644,816 total deduction claimed on their Schedule E for their share of FMC's reported net loss. An S corporation such as FMC is not subject to federal income tax, *see* § 1363(a), but its taxable income is computed, *see* § 1363(b)(1), and its income and deductions are passed through to its shareholders pro rata, *see* § 1366(a)(1).

**[\*28]** for both the yacht and the airplane. *See infra* OPINION, Part II.A and II.C. We allow the deductions claimed for 2008 for the storage, maintenance, and upkeep expenses for the yacht and the airplane (and flying-lesson expenses). *See infra* OPINION, Part II.B and II.D.

On its 2009 Form 1120S, FMC claimed $281,347 of depreciation deductions for both its yacht and its airplane and $21,893 of deductions for storage, maintenance, and upkeep expenses for both its yacht and its airplane.[21] The notice of deficiency disallowed all these deductions, resulting in a total disallowance of $303,240. We disallow the depreciation deductions claimed for 2009 for the yacht and the airplane. *See infra* OPINION, Part II.A and II.C. We allow the deductions claimed for 2009 for the storage, maintenance, and upkeep expenses for both the yacht and the airplane. *See infra* OPINION, Part II.B and II.D.

A. *We sustain the disallowance of depreciation deductions FMC claimed for its yacht.*

Although FMC claimed depreciation deductions related to its yacht, Dr. Conrad stated in his answering brief that "[t]he depreciation [for the yacht] is not important to me and can be denied or withdrawn." We consider this a waiver of the claim to the depreciation deductions. *See* Rule 151(e)(5); *Amazon.com, Inc. & Subs. v. Commissioner*, 148 T.C. 108, 220 (2017) (concluding that an argument not made by a party in its brief is waived), *aff'd*, 934 F.3d 976 (9th Cir. 2019). We therefore sustain the determination in the notice of deficiency that FMC is not entitled to depreciation deductions claimed with respect to its yacht for 2008 and 2009.

B. *The expenses for the storage, maintenance, and upkeep of FMC's yacht are deductible.*

We next address the deductions for storage, maintenance, and upkeep expenses FMC claimed related to its yacht. Section 162(a) generally allows a deduction for ordinary and necessary expenses paid or incurred in carrying on a trade or business.

Section 212(2) also allows a deduction to individuals for "ordinary and necessary expenses paid or incurred . . . for the management, conservation, or maintenance of property held for the production of

---

[21] As the Conrads were 51.25% owners of FMC, their share of these claimed deductions was $155,422, which was incorporated into the $278,989 total deduction claimed on their Schedule E for their share of FMC's reported net loss.

[*29] income." This provision was enacted after *Higgins v. Commissioner*, 312 U.S. 212, 218 (1941), held that under the predecessor of section 162 (section 23(a) of the Revenue Act of 1932, ch. 49, 47 Stat. 169, 179), an individual without a business could not deduct the expenses of managing, conserving, and maintaining property held for the production of income. The predecessor to section 212(2) (i.e., section 23(a)(2) of the Internal Revenue Code of 1939, as amended by the Revenue Act of 1942, ch. 619, § 121(a), 56 Stat. 798, 819) was enacted to allow such an individual to deduct such expenses. *United States v. Gilmore*, 372 U.S. 39, 45 (1963); *see also Brown v. United States*, 526 F.2d 135, 138 (6th Cir. 1975) ("The purpose of the provisions now contained in Section 212 was to create a parity of treatment between such nonbusiness expenses and similar business expenses which had long been deductible."). Because section 212(2) provides a deduction only for individuals, it cannot serve as authority for a corporation to deduct the expenses of managing, conserving, and maintaining property held for the production of income. However, a corporation is not precluded from deducting such expenses under the authority of other Code provisions. Indeed, Bittker and Eustice's treatise on corporate tax explains that a corporation can deduct, under section 162(a), the expenses of managing, conserving, and maintaining property held for the production of income:

> Section 212 is restricted to individuals, however, presumably on the theory that § 162(a) covers the same ground for corporations that §§ 162(a) and 212 in combination cover for other taxpayers.[25] Thus, if a corporation engaged in manufacturing holds some securities as an incidental investment, the cost of a safe-deposit box, investment advice, bookkeeping, and so forth incurred with respect to the securities would be deductible under § 162(a) as a trade or business expense, even though an individual proprietor holding such securities would have to resort to § 212 as authority for deducting such expenses.

[25]During the 1942 hearings on § 212, a taxpayer representative recommended enlargement of § 212 to include corporations. See Hearings on Revenue Act of 1942 Before the Senate Finance Comm., 77th Cong., 2d Sess. 1733 (1942). The recommendation was not adopted, probably because it was thought to be unnecessary. At any rate, it has been generally assumed since 1942 that a corporation can deduct under § 162(a) any expenses that could be deducted under § 212 by an individual proprietor or partnership. *See generally* Bittker &

**[\*30]** Lokken, Federal Taxation of Income, Estate and Gifts ¶ 20.5.1 (Warren, Gorham & Lamont, 3d ed. 1999) . . . .

Boris I. Bittker & James S. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 5.03, at \*2 (2020), Westlaw FTXCORP.

A corporation's deduction of the expenses of managing, conserving, and maintaining an asset is not unlimited. A corporation may deduct these expenses under section 162(a) if the acquisition and ownership of the asset is primarily associated with profit-motivated purposes and if the personal use of the property by shareholders, officers, or other individuals in control of corporate affairs is distinctly secondary and incidental.[22] *Int'l Artists, Ltd. v. Commissioner*, 55 T.C. 94, 104 (1970). But "if the acquisition and maintenance is primarily motivated by personal considerations, the deductions must be disallowed."[23] *Id.* And if "substantial business *and* personal motives

---

[22] An example of a yacht's expenses' being deductible under section 162(a) is *Tr. Prop. No. 4 v. Commissioner*, 21 B.T.A. 627 (1930). A corporation bought a yacht for $6,000 in 1915. *Id.* at 628. The yacht was used to take out the corporation's customers. *Id.* The president of the corporation owned his own boat that he used for his personal purposes. *Id.* During 1923, the corporate yacht was temporarily inactive because it was being repaired in dry dock. *Id.* The Board of Tax Appeals held that the cost of the repairs was deductible because the yacht had been acquired and used to entertain the company's customers and because it had not been used by the corporation's president strictly for personal purposes. *Id.* at 628–29.

[23] An example of a yacht's expenses' being disallowed as a deduction under section 162(a) is *Savarona Ship Corp. v. Commissioner*, 1 T.C.M. (CCH) 89 (1942). Philadelphia socialite Emily R. Cadwalader was the president and major shareholder of a corporation that commissioned the construction of a yacht for $2.1 million. *Id.* at 89–90. In July 1931 the yacht was completed. *Id.* at 90. During the month of October 1931 Cadwalader chartered the yacht herself. *Id.* For two weeks in January 1932 she again chartered the yacht herself. *Id.* at 91. From January to March 1932 a friend of hers charted the yacht. *Id.* at 90–91. For part of April 1932 Cadwalader chartered the yacht herself. *Id.* at 91. In 1933 a German production company chartered the yacht for a short time to make a film. *Id.*

For 1937, the year at issue, the yacht was unused, but the corporation still incurred costs to maintain it. *Id.* The Board of Tax Appeals held that the maintenance expenses were nondeductible. *Id.* The Board found that the yacht had been bought primarily for the use of Cadwalader. *Id.* at 92. The Board reasoned that the mere fact that the yacht was unused during the year at issue did not "show an abandonment of the yacht for pleasure purposes." *Id.*

**[\*31]** exist," then "allocation becomes necessary."[24] *Id.* at 105 (emphasis added).

FMC is an S corporation. In general, S corporations are not subject to income tax. § 1363(a). Instead, an S corporation's income is passed through to its shareholders. § 1366(a)(1). This is done in two ways. First, a shareholder must include in income the shareholder's pro rata share of the S corporation's "separately stated items of income or loss," defined by section 1366(a)(1)(A) as "items of income [or] loss . . . the separate treatment of which could affect the liability for tax of any shareholder." *See also* Treas. Reg. § 1.1366-1(a)(2). Second, the shareholder must include in income the shareholder's pro rata share of the S corporation's "nonseparately stated income or loss," defined by section 1366(a)(2) as "gross income minus the deductions . . . determined by excluding all items described in [section 1366(a)(1)(A)]." *See also* Treas. Reg. § 1.1366-1(a)(3).

Deductions under section 162(a) (i.e., business expenses) are included in the computation of an S corporation's nonseparately stated income (or loss). *See* Treas. Reg. § 1.1366-1(a)(2) (section 162(a) is not enumerated in the list of separately stated items); *see also Dunn v. Commissioner*, T.C. Memo. 2010-198, 2010 Tax Ct. Memo LEXIS 234, at *25 n.11 (stating that deductions under section 162(a) are aggregated with the S corporation's other items of income, deductions, losses, and credits). Deductions under section 167(a) (i.e., depreciation deductions) are also included in the computation of an S corporation's nonseparately stated income (or loss). *See* Treas. Reg. § 1.1366-1(a)(2) (section 167(a) is not enumerated in the list of separately stated items); *see also Broz v. Commissioner*, 137 T.C. 25, 30 (2011) (depreciation deduction factored

---

[24] An example of a yacht's expenses' being allocated between deductible section 162(a) business expenses and nondeductible personal expenses is *Hal E. Roach Studios v. Commissioner*, 20 B.T.A. 917 (1930). In that case a corporation that produced films bought a yacht in 1922 to be used in the production of films at sea. *Id.* at 918. Shortly after the purchase, the corporation stopped producing sea films. *Id.* As a result the yacht was used very little for film production. *Id.* For much of 1922 the yacht was attached to its moorings. *Id.* Occasionally the yacht was used for personal purposes of Hal E. Roach, *Id.*, whose name suggests that he was the owner of the corporation.

The Board of Tax Appeals found that the corporation acquired the yacht "solely for business purposes," that the yacht "was not used more than a dozen times for picture production," and that "had the boat not been used at all for pleasure[,] much of the expense of maintenance would have been incurred nevertheless." *Id.* at 919. The Board held that one-half of the expense of maintaining the yacht in 1922 was an ordinary and necessary expense of the corporation. *Id.* The other half of the expense was held to be nondeductible. *Id.*

[*32] into the computation of the S corporation's income, which was passed through to the shareholder; the dispute was over the amount of depreciation).

Deductions under section 212 are separately stated items of income or loss. *See* Treas. Reg. § 1.1366-1(a)(2)(vi) ("[S]eparately stated items of the S corporation include . . . the additional itemized deductions for individuals provided in part VII of subchapter B (section 212 and following) of the Internal Revenue Code."); *see also Dunn*, 2010 Tax Ct. Memo LEXIS 234, at *25 n.11 ("[I]temized deductions under sec. 212 . . . must be separately stated rather than aggregated with the S corporation's other items of income, deductions, losses, and credits."); 1 Richard D. Blau et al., *S Corporations: Federal Taxation* § 7.57 (2021) (stating that deductions under section 212 are among items that are required to be separately stated); James S. Eustice, Joel D. Kuntz & John A. Bogdanski, *Federal Income Taxation of S Corporations* ¶ 7.05[5][a] (Nov. 2021) ("[Treas. Reg. § 1.1366-1(a)(2)(vi) reveals], however, that items that would be deductible at the corporate level under Section 212 pass through to the shareholders, who may deduct them, even though the corporation technically does not get to do so."). They are not deductible in computing the S corporation's nonseparately stated income or loss. *See* § 1363(b)(2) (disallowing to an S corporation deductions referred to in section 703(a)(2)); § 703(a)(2)(E) (providing that among the deductions disallowed to a partnership are those in sections 211–223); *see also* Treas. Reg. § 1.1366-1(a)(3) (defining the nonseparately stated income or loss of the S corporation as excluding "any item requiring separate computation under" Treasury Regulation § 1.1366-1(a)(2)); Treas. Reg. § 1.1366-1(a)(2)(vi) (providing that separately stated items of an S corporation include the deductions in sections 212–223).

Section 274 disallows deductions otherwise permitted under section 162(a), section 167(a), or section 212. There are two provisions of section 274 we will discuss here: section 274(a)(1)(B) and section 274(d). Section 274(a)(1)(B) disallows deductions for the expenses of a facility used in connection with entertainment. Section 274(d) imposes rules known as "strict substantiation" requirements that allow certain types of deductions only if the taxpayer supplies contemporaneous substantiation of certain informational elements supporting the deductions. *See Falsetti v. Commissioner*, 85 T.C. 332, 358 (1985). The types of deductions covered by the version of section 274(d) in effect during 2008 and 2009 included (1) deductions for traveling expenses, (2) deductions with respect to a facility used in connection with

[*33] entertainment, (3) deductions for gifts, and (4) deductions with respect to "listed property" (defined by section 280F(d)(4)(A)(ii) to include any property used as a means of transportation).[25] The requirement (in section 274(d)) that deductions with respect to a facility used in connection with entertainment be strictly substantiated is a moot requirement after 1978. This is because such deductions are disallowed by section 274(a)(1)(B) after the provision's amendment in 1978.[26] *See* Revenue Act of 1978, Pub. L. No. 95-600, § 361, 92 Stat. 2763, 2847 (amending § 274(a)(1)(B)).

FMC reported the nondepreciation deductions for its yacht under section 162(a). (The deductions were reported on Part III, line 1 of the 2008 and 2009 Schedules K–1, Shareholder's Share of Income, Deductions, Credits, etc.,[27] sent to FMC's shareholders, which reported the shareholders' pro rata shares of FMC's nonseparately stated income or loss. Recall that section 162(a) deductions, but not section 212 deductions, are included in the computation of nonseparately stated income or loss. Treas. Reg. § 1.1366-1(a)(2).) In litigation Dr. Conrad defends the deductions by making the following points: the 71-day yacht trip in 2003 was an activity by which the Conrads entertained and met with WOMF's clients; for several years after the trip FMC tried and failed to sell the yacht; and because the yacht was not sold until after the years at issue, FMC had to incur expenses of storing, maintaining, and keeping up the yacht during the years at issue.

The IRS contends that the nondepreciation expenses of the yacht are not deductible under section 162(a) because FMC did not intend to

---

[25] In 2017 Congress amended section 274(d). Under the current version, section 274(d) no longer applies to deductions with respect to a facility used in connection with entertainment. *See* Tax Cuts and Jobs Act of 2017 (TCJA), Pub. L. No. 115-97, § 3304(a), 131 Stat. 2054, 2124.

[26] When both section 274(a)(1)(B) and section 274(d) were enacted in 1962, section 274(a)(1)(B) did not completely disallow deductions for facilities used in connection with entertainment. *See* Revenue Act of 1962, Pub. L. No. 87-834, § 4(a), 76 Stat. 960, 974–76. However, section 274(a)(1)(B) was amended in 1978 to disallow these deductions.

[27] For each taxable year, an S corporation sends Schedule K–1 to each of its shareholders. The Schedule K–1 reports (1) the shareholder's pro rata share of the S corporation's nonseparately stated income or loss and (2) the shareholder's pro rata share of the S corporation's separately stated items of income or loss.

**[\*34]** use the yacht in its business after 2003. We reject the IRS's contention for reasons we explain in the paragraph below.[28]

FMC bought the yacht in 2003 so that Dr. Conrad could solicit customers to promote FMC's business, and he did so on a 71-day trip in 2003. After the trip, FMC held the yacht for sale but was unable to sell it immediately. No further use was made of the yacht, either business or personal. FMC had to incur storage, maintenance, and upkeep expenses during the years at issue (2008 and 2009) because it could not sell the yacht. During the years at issue the yacht remained FMC's business asset. It was not used by the Conrads for personal purposes. Therefore, FMC can deduct the storage, maintenance, and upkeep expenses for the yacht under section 162(a). *See Int'l Artists, Ltd.*, 55 T.C. at 104; *Tr. Prop. No. 4*, 21 B.T.A. at 628–29.

We suppose that alternatively, one might view FMC's expenses of maintaining, storing, and keeping up its yacht as corresponding to the deduction provided by section 212(2) for the "ordinary and necessary expenses paid or incurred during the taxable year [here 2008 and 2009] . . . for the management, conservation, or maintenance of property held for the production of income." § 212(2). As an itemized deduction, though, a section 212 deduction is generally less favorable for taxpayers than an above-the-line deduction such as a section 162(a) deduction. *See Guill v. Commissioner*, 112 T.C. 325, 328 (1999) (stating that a deduction under section 212 for legal costs unrelated to a trade or business, and therefore not deductible under section 162(a), is an itemized deduction).[29] Usually, it is up to the IRS to make arguments that the taxpayer should be subject to greater tax than the taxpayer reported. Here, the IRS has not argued that the yacht expenses must be deducted under section 212(2). We therefore need not consider such a theory. *See Feigh v. Commissioner*, 152 T.C. 267, 277 (2019) ("Our job is to consider the issues advanced by the parties, not to craft alternative arguments never raised.").

The IRS also argues that even if the expenses of the yacht would be deductible under section 162, the deductions are nonetheless disallowed under section 274 because the yacht is used in connection with entertainment. Specifically, the IRS argues that the yacht should

---

[28] The IRS also contends that the yacht is a facility used for entertainment, a contention we evaluate later.

[29] We discuss the differences between above-the-line deductions and itemized deductions in more detail *infra* OPINION, pp. 45–46.

**[\*35]** be considered a facility used in connection with entertainment because the Conrads have failed to meet the strict substantiation requirements of section 274. To understand the IRS's argument,[30] we must delve into the history of section 274(a)(1)(B).

The current version of section 274(a)(1)(B)—applicable for the years at issue—disallows deductions for the expenses of a facility used in connection with entertainment, amusement, or recreation. A prior version of section 274(a)(1)(B)—applicable only for expenses incurred before January 1, 1979—disallowed deductions for the expenses of a facility used in connection with entertainment unless the facility was used primarily to further the taxpayer's business and the expenses were directly related to the active conduct of the business. *See* § 274(a)(1)(B) (1964) (before amendment by the Revenue Act of 1978, § 361, 92 Stat. at 2847). A regulation related to the prior version of section 274(d), Treasury Regulation § 1.274-5T(c)(6)(iii), imposed a strict substantiation requirement for a taxpayer seeking to prove that a facility was used primarily to further the taxpayer's business. This strict substantiation requirement is applicable only for expenses incurred before January 1, 1979. The IRS argues that the Conrads failed to substantiate that the yacht was primarily used in FMC's business. Although the IRS words the argument in a way that obviously tracks the regulation, the IRS does not directly cite the regulation.

The IRS's arguments regarding the primary use of the yacht are irrelevant under current law. It no longer matters whether a facility is used primarily in furtherance of a taxpayer's trade or business or whether a taxpayer has strictly substantiated that a facility is so used. Under the current version of section 274 the relevant question is whether FMC's yacht was used in connection with entertainment. *See*

---

[30] The IRS's arguments against the deductibility of the nondepreciation yacht expenses are confused because the IRS cites pre-1979 law. The IRS's argument that the yacht is a facility used in connection with entertainment is made in its opening brief in the paragraph spanning pages 29 and 30 and in the second full paragraph on page 33. The IRS's reasoning that the yacht was not used primarily in furtherance of FMC's trade or business is stated in two full paragraphs on page 30, in the paragraph spanning pages 30 and 31, and in the full paragraph on page 31. The IRS's support for its reasoning (i.e., that the Conrads have failed to meet strict substantiation requirements regarding the fact that the yacht was primarily used to further FMC's business) is given in the full paragraph on page 34 and in the paragraph spanning pages 34 and 35. The IRS's argument that the yacht expenses are not encompassed by section 162(a), because FMC did not intend to use the yacht in its business after 2003, is made in the paragraph spanning pages 35 and 36 and in the first full paragraph on page 36.

**[*36]** § 274(a)(1)(B). Treasury Regulation § 1.274-2(e)(2) provides that property owned by a taxpayer is considered to constitute a facility used in connection with entertainment if it is "used during the taxable year for, or in connection with, entertainment." *See also Harrigan Lumber Co. v. Commissioner*, 88 T.C. 1562, 1565 n.7 (1987) (stating that the provisions in Treasury Regulation § 1.274-2(e)(2), (3), and (4) govern expenditures paid or incurred after December 31, 1978), *aff'd without published opinion*, 851 F.2d 362 (11th Cir. 1988). Treasury Regulation § 1.274-2(b)(1)(i) provides that the term "entertainment" means any activity that is generally considered to constitute entertainment, amusement, or recreation. Thus, FMC's yacht is a facility used in connection with entertainment if it was used during 2008 and 2009 for, or in connection with, an activity generally considered to be entertainment, amusement, or recreation.

During the 2003 trip the yacht was used in connection with entertainment.[31] But during 2008 and 2009 the yacht was docked and unused. Therefore, it was not "used during the taxable year [2008, 2009] for, or in connection with, entertainment." Treas. Reg. § 1.274-2(e)(2). For these years the yacht was not a facility used in connection with entertainment. *See id.* Accordingly, section 274(a)(1)(B) does not disallow FMC's deductions for the yacht's storage, maintenance, and upkeep expenses.

The IRS does not rely on the strict substantiation requirements of section 274(d) other than for the assertion (irrelevant, as we have explained) that the Conrads did not strictly substantiate that the yacht was used primarily for the furtherance of FMC's business. For example, the IRS does not argue that the nondepreciation expenses of the yacht must be strictly substantiated under the rules for listed property. *See* § 274(d)(4). We therefore do not consider whether the yacht expense

---

[31] The regulations provide that whether an activity is generally considered to constitute entertainment, amusement, or recreation is determined by an "objective test." Treas. Reg. § 1.274-2(b)(1)(ii). However, the regulations also state that "in applying this test the taxpayer's trade or business shall be considered." *Id.* In explaining how a taxpayer's trade or business should be considered, the regulations give as an example a manufacturer of dresses that puts on a fashion show to introduce its products to a group of store buyers. *Id.* The regulations state that the show would not generally constitute entertainment. *Id.* However, the regulations state that a fashion show conducted by an appliance distributor for the "wives" of the distributor's retailers would generally be considered entertainment. *Id.* Under these examples, FMC's yacht cruise in 2003 would be an entertainment activity even though a yacht operated by a cruise line would not be. FMC is not in the business of entertainment, but a cruise line is in the business of entertainment.

[*37] deductions meet the strict substantiation requirements of section 274(d). *See Feigh*, 152 T.C. at 277.

One common issue that arises in determining whether an expense is deductible under section 162(a) is whether it was paid or incurred during the year at issue. *See Commissioner v. Lincoln Sav. & Loan Ass'n*, 403 U.S. 345, 352 (1971) (stating that an item's having been paid or incurred during the taxable year is one of five elements required for deducting an expense under section 162(a)). In this case, however, the IRS has not argued that FMC did not pay or incur the expenses of maintaining, keeping up, and storing the yacht during 2008 and 2009.[32]

We have addressed all arguments made by the IRS. Therefore, we do not sustain the IRS's disallowance of deductions for the storage, maintenance, and upkeep expenses incurred by FMC for its yacht during the years at issue.

---

[32] The notice of deficiency disallowed the nondepreciation yacht deductions but gave only the obscure explanation that the disallowance was the result of the IRS's changing FMC's "accounting method." A change in method of accounting involves the proper timing for a deduction. Treas. Reg. § 1.446-1(e)(2)(ii)(b) ("[A] change in method of accounting does not include adjustment of any item of income or deduction that does not involve the proper time for inclusion of the item of income or the taking of a deduction."). FMC reported that it used the accrual method of accounting to prepare its Forms 1120S. Under that method of accounting, the taxpayer claims deductions for the year the corresponding liability is incurred. Treas. Reg. § 1.461-1(a)(2). By contrast, under the cash method of accounting, the taxpayer claims deductions for the year that the corresponding amount is paid. Treas. Reg. § 1.461-1(a)(1). It is unclear from the notice of deficiency whether the IRS intended to change FMC's method of accounting to the cash method of accounting (or to some other method of accounting). In any event, the IRS's change to an accounting method is different from an argument that an item was never paid or incurred.

The IRS's Answer gave no further explanation as to why it disagreed with the nondepreciation yacht deductions. On May 5, 2016, the IRS stated in court that it was challenging that the yacht expenses were "incurred." On that same day, the Court continued the case and told the Conrads to give FMC's records regarding the nondepreciation yacht deductions and other issues to the IRS. At the continued trial date and after the Conrads were supposed to have given the IRS records related to the yacht, the IRS explained again the nature of its arguments regarding the yacht deductions. The IRS argued that the yacht was a facility used in connection with entertainment, but it did not identify a challenge to whether the expenses were actually paid or incurred. The IRS's Pretrial Memorandum did not make such a challenge either. Nor did the IRS raise in its briefs the question of whether the yacht expenses were paid or incurred. Under the circumstances, the IRS did not preserve any argument that the nondepreciation yacht expenses were not paid or incurred. *See Amazon.com, Inc.*, 148 T.C. at 220.

**[\*38]**  C.    *FMC cannot deduct depreciation for its airplane.*

We next address the deductions for depreciation of FMC's airplane. Section 167(a) allows a deduction for depreciation of property if the property is either (1) used in a trade or business or (2) held for the production of income. Treasury Regulation § 1.167(a)-10(b) provides that a depreciation deduction under section 167(a) is available only for the tax year in which the property was placed in service and later years. Section 179(a) allows a taxpayer to affirmatively elect to deduct the entire cost of certain property for the year in which the property is placed in service. The election must be made on the taxpayer's return. § 79(c).

FMC's 2008 and 2009 returns claimed depreciation deductions for its airplane and did not elect to deduct for either year the entire cost of the airplane under section 179. Nevertheless, the IRS's challenge to the depreciation deductions for FMC's airplane is that the airplane was never placed in service within the meaning of "[s]ection 179(a)." Both sections 167 and 179 require that the property be placed into service as a condition for deductions. *See* § 179(a) (providing that a depreciation deduction "shall be allowed as a deduction for the taxable year in which the section 179 property is placed in service"); Treas. Reg. § 1.167(a)-10(b) ("The period for depreciation of an asset shall begin when the asset is placed in service . . . ."); Treas. Reg. § 1.167(a)-11(e)(1)(i) (defining when property is placed in service for purpose of Treasury Regulation § 1.167(a)-10(b)); *Baca v. Commissioner*, T.C. Memo. 2019-78, at \*25 (determining whether an asset was placed in service for purpose of section 179 by reference to the definition of placed in service in Treasury Regulation § 1.167(a)-11(e)(1)(i)). Therefore, we are willing to consider the proposition that section 167 depreciation deductions for FMC's airplane should be denied on placed-in-service grounds even though the IRS contests the depreciation deductions as if FMC sought a section 179 deduction.

Regulations provide that property is considered "first placed in service" when it is "first placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business [or] in the production of income . . . ." Treas. Reg. § 1.167(a)-11(e)(1)(i).

It is the "taxpayer . . . who gets to determine what an asset's 'specifically assigned function' is." *Brown v. Commissioner*, T.C. Memo. 2013-275, at \*35 (first citing *Consumers Power Co. v. Commissioner*, 89

**[\*39]** T.C. 710 (1987); and then citing *Valley Nat. Fuels v. Commissioner*, T.C. Memo. 1991-341, 1991 Tax. Ct. Memo. LEXIS 390, *aff'd without published opinion*, 990 F.2d 1266 (9th Cir. 1993)). FMC's specifically assigned function for the airplane was for Dr. Conrad to personally fly the airplane in order to travel cross-country for client meetings and business trips. Dr. Conrad credibly testified that the purpose of buying the airplane was for him to pilot the airplane himself. He credibly testified that hiring licensed pilots to fly FMC's airplane would have been not only cost prohibitive but also logistically challenging because of the lack of available pilots who were certified to fly this particular type of airplane.

Because Dr. Conrad never completed his certification and was thus never licensed to fly FMC's airplane, the airplane was never "in a condition or state of readiness and availability for [its] specifically assigned function" in either 2008 or 2009. *See* Treas. Reg. § 1.167(a)-11(e)(1)(i).[33]

Our conclusion is not affected by the fact that FMC leased the airplane on a few occasions to third parties while waiting for Dr. Conrad to finish earning his license to pilot the airplane. In *Cooper v. Commissioner*, 88 T.C. 84, 113–14 (1987), and *Waddell v. Commissioner*, 86 T.C. 848, 898 (1986), *aff'd*, 841 F.2d 264 (9th Cir. 1988), we held that the assets in question were placed in service as soon as they were available to be leased because the taxpayers' specifically assigned functions were to lease the assets to third parties. These assets, however, are distinguishable from the FMC airplane because FMC's specifically assigned function for its airplane was to allow Dr. Conrad to

---

[33] We reached a similar conclusion that the lack of certified pilots precludes an airplane from being available for its specifically assigned function (of being flown) in *Douglas v. Commissioner*, T.C. Memo. 2011-214, 2011 WL 3849550. In that case, the taxpayers' wholly owned S corporation bought an airplane for use in its trucking business. *Id.* at \*1. The S corporation's specifically assigned function for the airplane, we held, was to allow the S corporation to fly truck drivers on short notice so that they could replace other drivers who were unable to finish their deliveries. *Id.* at \*2. We concluded that the S corporation had never placed the airplane in service because none of its employees had been licensed to fly the airplane. *Id.* The record also failed to show that it would have been possible for the S corporation to hire outside pilots. *Id.* Because the airplane could not be flown by employees or non-employees, the airplane was never capable of being used in the S corporation's business and was therefore not placed in service. *Id.*; *see also Siskiyou Commc'ns, Inc. v. Commissioner*, T.C. Memo. 1990-429, 1990 Tax Ct. Memo LEXIS 446, at \*15 (concluding that the taxpayer's new phone system was not placed in service until the taxpayer's employees were trained to operate the system).

**[\*40]** personally fly the airplane for cross-country business trips. Since this was the intended use of the airplane, Dr. Conrad would need to establish that an asset that is not available for its original intended function can nonetheless be placed in service by being available for an alternative function (in the Conrads' case, leasing the airplane to third parties). The regulations seem unexpressive as to whether a function other than the originally intended function can qualify as a specifically assigned function. Treas. Reg. § 1.167(a)-11(e)(1)(i) ("Property is first placed in service when first placed in a condition or state of readiness and availability for a specifically assigned function . . . ."). Caselaw suggests that only the taxpayer's original intended function can be the specifically assigned function. *See Brown*, T.C. Memo. 2013-275, at \*37 ("An asset must instead be available for its intended use on a regular, ongoing basis before we can find it 'placed in service' in the tax year in question." (emphasis omitted); the taxpayer's plane had not been placed in service, even though it had been used for a few trips, because the specifically assigned function contemplated physical modifications completed after the year at issue); *Doherty v. Commissioner*, T.C. Memo. 1992-573, 1992 WL 237243, at \*5 ("Alternate use is not sufficient for an asset to be placed in service." (citing *Consumers Power Co.*, 89 T.C. 710)). Even if a specifically assigned function can be a function other than that originally intended by the property owner, leasing of the airplane by FMC should not qualify as a specifically assigned function because there is no indication that renting the airplane out was as useful to FMC as using the airplane itself (piloted by Dr. Conrad).[34] There is no evidence of how much rental income FMC earned from leasing the airplane. FMC reported total income of $626,587 and $253,947 on its Forms 1120S for 2008 and 2009, respectively. The table below shows how these amounts were broken out on the returns:

---

[34] We reached a similar conclusion in *Valley Nat. Fuels*, 1991 Tax Ct. Memo LEXIS 390, at \*26. In that case, the taxpayer attempted to place an ethanol distillation plant in service during 1983. *Id*. at \*13. The plant's specifically assigned function was to produce "198.2+ proof" fuel. *Id*. at \*14. We concluded that the plant was not placed in service for its specifically assigned function during 1983. *Id*. The taxpayer argued that the plant was placed in service during 1983 because in that year the plant produced lower-grade fuel that the taxpayer was able to sell to third parties. *Id*. at \*14–15. We rejected the taxpayer's argument in part because the taxpayer failed to show that the lower-grade fuel "was actually sold commercially in . . . a market, or that such a market existed." *Id*. at \*16; *see also Olsen v. Commissioner*, T.C. Memo. 2021-41, at \*40 (concluding that the leasing of the taxpayer's asset did not qualify as placing the asset in service in part because the taxpayer "was not engaged in a leasing business and his venture was certainly not 'profit-motivated'"), *aff'd on other grounds*, 52 F.4th 889 (10th Cir. 2022).

41

| Description | 2008 | 2009 |
|---|---|---|
| Income/Loss from passthrough entities | −$48,759 | −$37,634 |
| Fund management income | 641,829 | 290,329 |
| Other income | 33,517 | 1,252 |
| Total income | $626,587 | $253,947 |

Assuming arguendo that the descriptions and amounts above are accurate, the most that FMC could have earned from renting the airplane was $33,517 in 2008 and $1,252 in 2009, the amounts reported as "Other income" for the respective years. (The assumption that the amounts reported as "Other income" were composed entirely of rents from the airplane is a very generous hypothetical given that no supporting evidence such as rental agreements, invoices, testimony, etc. has been produced to corroborate the airplane's rental.) Such revenue still would not have covered the cost of expenses incurred from owning the airplane. In 2008 FMC incurred $178,917 of expenses related to the airplane, well more than "Other income" earned of $33,517. And while for 2009 the record does not indicate how much of the $21,893 of storage, maintenance, and upkeep for the yacht and the airplane was incurred just for the airplane, we find it unlikely that it was less than $1,252. The rental of the airplane was at most an effort to reduce the cost of storage, maintenance, and upkeep expenses, not an economically profitable use. *See Doherty v. Commissioner*, 1992 WL 237243, at *4. We hold, therefore, that FMC's leasing of the airplane did not place the airplane in service for a specifically assigned function.

Because the airplane was not placed in service, FMC cannot deduct depreciation under section 167(a) with respect to the airplane. *See* Treas. Reg. § 1.167(a)-10(b). We therefore sustain the determination in the notice of deficiency that FMC is not entitled to depreciation deductions with respect to its airplane for 2008 and 2009.

> D.    *FMC can deduct expenses for the storage, maintenance, and upkeep of its airplane, as well as the cost of Dr. Conrad's flying lessons.*

We next address whether FMC can deduct its costs for the storage, maintenance, and upkeep of its airplane, as well as the costs for Dr. Conrad's flying lessons. Section 162(a) allows taxpayers to deduct

[*42] ordinary and necessary expenses paid or incurred in carrying on a trade or business. Section 262(a) prevents a taxpayer from deducting otherwise deductible expenses if the expenses are "personal, living, or family expenses."

Section 274(d)(4) requires the taxpayer to comply with strict substantiation requirements for any deductions related to listed property. An airplane qualifies as listed property. *See* § 280F(d)(4)(A)(ii) (providing that listed property includes "any . . . property used as a means of transportation"); Treas. Reg. § 1.280F-6(b)(2)(i) (defining "means of transportation" to include airplanes). The IRS did not argue at trial or in its briefs that FMC failed to comply with section 274(d) as to the airplane. Moreover, the IRS conceded that the airplane expenses were actually incurred. *See* § 274(d) ("No deduction or credit shall be allowed . . . (4) with respect to any listed property . . . unless the taxpayer substantiates by adequate records or by sufficient evidence . . . the amount of such expense . . . ."). Thus, we need not and do not consider whether FMC failed to satisfy the strict substantiation requirements of section 274(d) for the airplane's nondepreciation expenses. *See Feigh*, 152 T.C. at 277.

FMC claimed the nondepreciation deductions as section 162(a) deductions. (The deductions were reported on Part III, line 1 of the 2008 and 2009 Schedules K–1 sent to FMC's shareholders, which reported the shareholders' pro rata shares of FMC's nonseparately stated income or loss. Recall that section 162(a) deductions are included in the computation of nonseparately stated income or loss. Treas. Reg. § 1.1366-1(a)(2).) In litigation Dr. Conrad likewise contends that the storage, maintenance, and upkeep expenses, as well as the cost of his flying lessons, were ordinary and necessary in carrying on FMC's trade or business. Dr. Conrad specifically argues that FMC needed the airplane because WOMF had clients in 22 states and he was physically unable to drive these distances to meet with WOMF's clients. Dr. Conrad also argues that FMC needed him to earn his license to fly the plane himself because it was both prohibitively expensive and logistically unfeasible for FMC to hire certified pilots to fly the airplane.

The IRS's argument against the deductibility of the storage, maintenance, and upkeep expenses and the cost of Dr. Conrad's flying lessons is that the only use made of the airplane was training for Dr. Conrad to earn his license to fly the airplane, and this was a personal use. The IRS argues that since the airplane was used only for Dr. Conrad's (allegedly personal) flying lessons, the expenses incurred for

**[\*43]** storing, maintaining, and keeping the airplane were not ordinary and necessary in carrying on FMC's trade or business.

However, FMC bought the airplane so that Dr. Conrad could use it for corporate travel. FMC allowed Dr. Conrad to fly the airplane for training purposes and incurred the nondepreciation expenses for the airplane (including expenses for Dr. Conrad's flying lessons) so that he could earn his license to pilot the airplane himself while he performed tasks on behalf of FMC. Although Dr. Conrad failed to ever become licensed to fly the airplane, that does not change the fact that the expenses (including for Dr. Conrad's flying lessons) were incurred solely for FMC's business purposes. Furthermore, Dr. Conrad piloted the airplane only for this training purpose; he did not use the airplane for his personal activities. Thus, these expenses were not personal expenses of the Conrads but were instead business expenses of FMC. *See Int'l Artists, Ltd.*, 55 T.C. at 104; *Tr. Prop. No. 4*, 21 B.T.A. at 628–29.

An expense is deductible under section 162(a) only if it is paid or incurred during the year at issue. *See Commissioner v. Lincoln Sav. & Loan Ass'n*, 403 U.S. at 352. During trial, in response to the Court's question as to whether the IRS contested that the expenses were incurred, counsel for the IRS responded: "The expenses were incurred. The Appeals Officers looked through the documents and disallowed it just on the legal basis of the ordinary and necessary business assets." The IRS's statement is tantamount to a stipulation that whether the storage, maintenance, and upkeep expenses and cost of flying lessons were paid or incurred is not at issue. *See* Rule 91(e) (stating that a stipulation is binding); *Church of Scientology of Cal. v. Commissioner*, 83 T.C. 381, 524 (1984) (concluding that the IRS's "concession in open court . . . was the equivalent of a [binding] stipulation"), *aff'd*, 823 F.2d 1310 (9th Cir. 1987).

We hold that the nondepreciation expenses for FMC's airplane were not personal expenses of the Conrads but were instead ordinary and necessary business expenses of FMC that are deductible under section 162(a). Therefore, we do not sustain the IRS's determination that deductions for these expenses should be disallowed.[35]

---

[35] Even though FMC cannot deduct depreciation for the airplane under section 167, this does not compel the disallowance of FMC's nondepreciation deductions for the airplane. Section 162 does not require the taxpayer to place an asset in service for a specifically assigned function before a taxpayer may deduct an expense. So long as

**[\*44]** E.    *A summary of the allowed deductions related to the yacht and airplane for 2008 and 2009.*

The tables below summarize the allowable deductions by FMC and the Conrads related to the yacht and the airplane for 2008 and 2009.

| 2008 | | |
|---|---|---|
| *Expenses* | *FMC's deductions* | *The Conrads' deductions*[36] |
| Airplane and yacht depreciation expenses | -0- | -0- |
| Airplane and yacht non-depreciation expenses | $256,934[37] | $131,689 |

| 2009 | | |
|---|---|---|
| *Expenses* | *FMC's deductions* | *The Conrads' deductions* |
| Airplane and yacht depreciation expenses | -0- | -0- |
| Airplane and yacht non-depreciation expenses | $21,893 | $11,221 |

III.    *For both 2008 and 2009 the Conrads can deduct portions of the expenses related to their residences.*

The next issue we will address is whether the Conrads can claim deductions related to their personal residences for both 2008 and 2009. Several Code provisions are relevant to our discussion. Two of the

---

the nondepreciation expenses for the airplane are ordinary and necessary to FMC's business (and we conclude that they are), FMC can deduct these expenses. *See Noyce v. Commissioner*, 97 T.C. 670, 689–90 (1991).

[36] For both 2008 and 2009 51.25% of FMC's deductions flow through to the Conrads. *See supra* FINDINGS OF FACT, Part I.

[37] The $256,934 consists of $178,917 of nondepreciation expenses related to FMC's airplane and $78,017 of nondepreciation expenses related to FMC's yacht.

**[\*45]** relevant provisions are section 162(a) and section 212(2), which we have already discussed at length *supra*.

Section 163(a) allows a deduction for "all interest paid or accrued within the taxable year on indebtedness." However, section 163(h)(1) provides that noncorporate taxpayers cannot deduct any "personal interest." Section 163(h)(2) carves out several different types of interest from the definition of personal interest. Section 163(h)(2)(C) provides that "any interest which is taken into account under section 469 in computing income or loss from a passive activity" is not personal interest under section 163(h)(1). A passive activity generally includes a taxpayer's rental activity. § 469(c)(2), (7). Section 163(h)(2)(D) provides that "any qualified residence interest" is not personal interest under section 163(h)(1). "Qualified residence interest" includes "acquisition indebtedness with respect to any qualified residence of the taxpayer." § 163(h)(3)(A). A "qualified residence" includes "the principal residence . . . of the taxpayer." § 163(h)(4)(A)(i)(I).

Section 164(a)(1) allows a deduction for "State and local . . . real property taxes" paid by the taxpayer. Section 262(a) prevents a taxpayer from deducting otherwise deductible expenses if the expenses are "personal, living, or family expenses."

Importantly for our analysis, the Code does not treat all the above-mentioned deductions in the same way. Instead, the Code classifies deductions into two broad categories. The first category is known as above-the-line deductions because they are subtracted from gross income to calculate a taxpayer's adjusted gross income (AGI). *See* § 1 (defining gross income); § 62(a) (defining AGI as gross income minus certain deductions); *Knight v. Commissioner*, 552 U.S. 181, 184 (2008) (explaining that the deductions in the computation of AGI are referred to as above-the-line deductions). The taxpayer's AGI represents "the line." Any other allowable deductions are then subtracted from AGI to calculate the taxpayer's taxable income. This second group of deductions is referred to as itemized or "below-the-line" deductions because the deductions are subtracted from the taxpayer's AGI. § 63(d) (defining below-the-line deductions as all deductions except deductions in the

**[\*46]** computation of AGI, i.e., all deductions except above-the-line deductions).[38]

As between a below-the-line deduction and an above-the-line deduction, a taxpayer normally prefers the latter for three reasons. First, an above-the-line deduction is fully deductible regardless of the taxpayer's AGI, while certain below-the-line deductions are limited to the total amount of these certain deductions that exceeds a percentage of AGI. *See, e.g.*, § 67(a) (miscellaneous itemized deductions);[39] § 68(a) (itemized deductions of high-income taxpayers); § 213(a) (medical-expense deductions). Second, an above-the-line deduction reduces AGI, which, in turn, allows the taxpayer to claim more of the below-the-line deductions that are limited to the total amount of deductions that exceed a percentage of AGI. *See William L. Rudkin Testamentary Tr. v. Commissioner*, 124 T.C. 304, 307 (2005) (below-the-line deductions do not affect AGI), *aff'd*, 467 F.3d 149 (2d Cir. 2006), *aff'd sub nom. Knight v. Commissioner*, 552 U.S. 181 (2008). Third, above-the-line deductions can be claimed even if the taxpayer takes the standard deduction. § 63(a) and (b). By contrast, the taxpayer must choose between claiming the standard deduction or claiming below-the-line deductions.

Section 62(a) defines the deductions that are above-the-line deductions. Two types of above-the-line deductions are a section 162(a) deduction (i.e., ordinary-and-necessary business expenses of self-employed taxpayers) and a section 212 deduction attributable to the production of rents. *See* § 62(a)(1), (4). A section 163(a) deduction for interest expenses is not an above-the-line deduction under section 62(a) and is therefore an itemized deduction. § 63(d). However, an interest expense attributable to a business is an above-the-line deduction under section 162(a). *See McNutt-Boyce Co. v. Commissioner*, 38 T.C. 462, 464 (1962), *aff'd per curiam*, 324 F.2d 957 (5th Cir. 1963); *Standing v. Commissioner*, 28 T.C. 789, 795 (1957), *aff'd*, 259 F.2d 450 (4th Cir. 1958). And an interest expense attributable to the production of rents is an above-the-line deduction under section 212(2). *See Charles H. Ungerman, Jr. Revocable Tr. v. Commissioner*, 89 T.C. 1131, 1136

---

[38] For taxpayers who claim the standard deduction, taxable income is equal to AGI (i.e., gross income minus above-the-line deductions) minus the standard deduction. § 63(b).

[39] Under the TCJA, taxpayers may not deduct any miscellaneous itemized deductions for tax years 2018 through 2025. § 67(g). This provision is inapplicable here because we are dealing with tax years 2008 and 2009.

**[*47]** (1987); *Koshland v. Commissioner*, 19 T.C. 860, 862–63 (1953), *aff'd per curiam*, 216 F.2d 751 (9th Cir. 1954).

Real property taxes "directly attributable to a trade or business or to property from which rents or royalties are derived" are above-the-line deductions. Temp. Treas. Reg. § 1.62-1T(d). Real property taxes attributable to a taxpayer's personal use are below-the-line deductions. §§ 62, 63(d).

Section 280A disallows otherwise deductible expenses related to a taxpayer's residence. The relevant portions of section 280A are reproduced below:

> Sec. 280A.—Disallowance of certain expenses in connection with business use of home, rental of vacation homes, etc.
>
> (a) General rule.—Except as otherwise provided in this section, in the case of a taxpayer who is an individual or an S corporation, no deduction otherwise allowable under this chapter shall be allowed with respect to use of a dwelling unit which is used by the taxpayer during the taxable year as a residence.
>
> (b) Exception for interest, taxes, casualty losses, etc.—Subsection (a) shall not apply to any deduction allowable to the taxpayer without regard to its connection with his trade or business (or with his income-producing activity).
>
> (c) Exceptions for certain business or rental use; limitation on deductions for such use.—
>
>> (1) Certain business use.—Subsection (a) shall not apply to any item to the extent such item is allocable to a portion of the dwelling unit which is exclusively used on a regular basis—
>>
>>> (A) as the principal place of business for any trade or business of the taxpayer,
>>
>> . . . .
>>
>> (3) Rental use.—Subsection (a) shall not apply to any item which is attributable to the rental of the dwelling unit or portion thereof . . . .
>>
>> . . . .
>>
>> (5) Limitation on deductions.—In the case of a use described in paragraph (1) . . . and in the case of a use described in paragraph (3) where the dwelling unit is used by the taxpayer during the

**[\*48]** taxable year as a residence, the deductions allowed under this chapter for the taxable year by reason of being attributed to such use [i.e., the non-personal use described in paragraph (1) or paragraph (3)] shall not exceed the excess of—

(A) the gross income derived from such use for the taxable year, over

(B) the sum of—

(i) the deductions allocable to such use which are allowable under this chapter for the taxable year whether or not such unit (or portion thereof) was so used, and

(ii) the deductions allocable to the trade or business (or rental activity) in which such use occurs (but which are not allocable to such use) for such taxable year.

Any amount not allowable as a deduction under this chapter by reason of the preceding sentence shall be taken into account as a deduction (allocable to such use) under this chapter for the succeeding taxable year. Any amount taken into account for any taxable year under the preceding sentence shall be subject to the limitation of the 1st sentence of this paragraph whether or not the dwelling unit is used as a residence during such taxable year.

(6) Treatment of rental to employer.— Paragraphs (1) and (3) shall not apply to any item which is attributable to the rental of the dwelling unit (or any portion thereof) by the taxpayer to his employer during any period in which the taxpayer uses the dwelling unit (or portion) in performing services as an employee of the employer.

(d) Use as residence.—

(1) In general.—For purposes of this section, a taxpayer uses a dwelling unit during the taxable year as a residence if he uses such unit (or portion thereof) for personal purposes for a number of days which exceeds the greater of—

(A) 14 days, or

**[*49]**

(B) 10 percent of the number of days during such year for which such unit is rented at a fair rental.

For purposes of subparagraph (B), a unit shall not be treated as rented at a fair rental for any day for which it is used for personal purposes.

(2) Personal use of unit.—For purposes of this section, the taxpayer shall be deemed to have used a dwelling unit for personal purposes for a day if, for any part of such day, the unit is used—

(A) for personal purposes by the taxpayer or any other person who has an interest in such unit, or by any member of the family . . . of the taxpayer or such other person;

. . . .

(e) Expenses attributable to rental.—

(1) In general.—In any case where a taxpayer who is an individual or an S corporation uses a dwelling unit for personal purposes on any day during the taxable year (whether or not he is treated under this section as using such unit as a residence), the amount deductible under this chapter with respect to expenses attributable to the rental of the unit (or portion thereof) for the taxable year shall not exceed an amount which bears the same relationship to such expenses as the number of days during each year that the unit (or portion thereof) is rented at a fair rental bears to the total number of days during such year that the unit (or portion thereof) is used.

(2) Exception for deductions otherwise allowable.—This subsection shall not apply with respect to deductions which would be allowable under this chapter for the taxable year whether or not such unit (or portion thereof) was rented.

(f) Definitions and special rules.—

(1) Dwelling unit defined.—For purposes of this section—

(A) In general.—The term "dwelling unit includes a house, apartment, condominium, mobile home, boat, or similar

**[*50]**          property, and all structures or other property appurtenant to such dwelling unit.

The Treasury Department has published proposed regulations under section 280A. 45 Fed. Reg. 52,399, 52,403, 52,405 (Aug. 7, 1980); 48 Fed. Reg. 33,320, 33,325 (July 21, 1983). The relevant provisions of these proposed regulations are reproduced below:

§ 1.280A-2 Deductibility of expenses attributable to business use of a dwelling unit used as a residence.

. . . .

(*i*) Limitation on deductions.

. . . .

(2) Gross income derived from use of unit.

. . . .

(iii) Exclusion of certain amounts. For purposes of section 280A(c)(5)(A) and this section, gross income derived from use of a unit means gross income from the business activity in the unit reduced by expenditures required for the activity but not allocable to use of the unit itself, such as expenditures for supplies and compensation paid to other persons. . . .

. . . .

(5) Order of deductions. Business deductions with respect to the business use of a dwelling unit are allowable in the following order and only to the following extent:

(i) The allocable portions of amounts allowable as deductions for the taxable year under chapter 1 of the Code with respect to the dwelling unit without regard to any use of the unit in trade or business, *e.g.*, mortgage interest and real estate taxes, are allowable as business deductions to the extent of the gross income derived from use of the unit.

(ii) Amounts otherwise allowable as deductions for the taxable year under chapter 1 of the Code by reason of the business use of the dwelling unit (other than those which would result in an adjustment to the basis of property) are allowable to the extent the gross

**[*51]** income derived from use of the unit exceeds the deductions allowed or allowable under subdivision (i) of this subparagraph.

(iii) Amounts otherwise allowable as deductions for the taxable year under chapter 1 of the Code by reason of the business use of the dwelling unit which would result in an adjustment to the basis of property are allowable to the extent the gross income derived from use of the unit exceeds the deductions allowed or allowable under subdivisions (i) and (ii) of this subparagraph.

§ 1.280A-3 Deductibility of expenses attributable to the rental of a dwelling unit used as a residence.

. . . . .

(d) Limitation on deductions if taxpayer has used dwelling unit as a residence.

. . . .

(2) Gross rental income. For purposes of section 280A and this section gross rental income from a unit equals the gross receipts from rental of the unit reduced by expenditures to obtain tenants for the unit, such as realtors' fees and advertising expense. . . .

(3) Order of deductions. Deductions with respect to the rental use of a dwelling unit are allowable in the following order and only to the following extent:

(i) The allocable portions of amounts otherwise allowable as deductions for the taxable year under chapter 1 of the Code with respect to the dwelling unit without regard to the rental use of the unit, *e.g.*, mortgage interest and real estate taxes, are deductible as rental expenses to the extent of the gross rental income from the unit.

(ii) The allocable portions of amounts otherwise allowable as deductions for the taxable year under chapter 1 of the Code by reason of the rental use of the dwelling unit (other than those which would result in an adjustment to the basis of property) are

**[*52]**    allowable to the extent the gross rental income exceeds the deductions allowed or allowable under subdivision (i) of this subparagraph.

(iii) The allocable portions of amounts otherwise allowable as deductions for the taxable year under chapter 1 of the Code by reason of the rental use of the dwelling unit which would result in an adjustment to the basis of property are allowable to the extent the gross rental income exceeds the deductions allowed or allowable under subdivisions (i) and (ii) of this subparagraph.

Proposed regulations "carry no more weight than a position advanced on brief by [the IRS]." *F.W. Woolworth Co. v. Commissioner*, 54 T.C. 1233, 1265–66 (1970). However, as will be discussed in more detail *infra* OPINION, Part III.A.5 and III.B.2.d, we will use the proposed regulations' method for calculating the Conrads' allowable deductions under section 280A because the IRS argues that the regulations should be used for applying section 280A and because Dr. Conrad did not argue at trial or in his brief that the regulations' method should not be used to determine the Conrads' income from their condominium and house.

Taxpayers report their current-year deductions for business-use-of-home expenses, and any business-use-of-home deductions suspended and carried forward on account of section 280A(c)(5), on the Form 8829. Dr. Conrad's 2008 and 2009 Forms 8829 are reproduced below. These forms will be referred to when discussing how the Conrads reported the residence expenses for 2008 and 2009.

[*53]

| Form **8829** | | **Expenses for Business Use of Your Home** | | OMB No. 1545-0074 |
|---|---|---|---|---|

Form **8829**

Department of the Treasury
Internal Revenue Service (99)

**Expenses for Business Use of Your Home**
► File only with Schedule C (Form 1040).
Use a separate Form 8829 for each home you used for business during the year.
► See separate instructions.

OMB No. 1545-0074

**2008**

Attachment
Sequence No. **66**

Name(s) of proprietor(s)  THOMAS D CONRAD

Your social security number

### Part I  Part of Your Home Used for Business       CONSULTING

| | | | |
|---|---|---|---|
| 1 | Area used regularly and exclusively for business, regularly for daycare, or for storage of inventory or product samples (see instructions) | **1** | 3,750 |
| 2 | Total area of home | **2** | 7,500 |
| 3 | Divide line 1 by line 2. Enter the result as a percentage | **3** | 50.00 % |
| | For daycare facilities not used exclusively for business go to line 4. All others go to line 7. | | |
| 4 | Multiply days used for daycare during year by hours used per day ......... | **4** | hr |
| 5 | Total hours available for use during the year (366 days x 24 hours) (see instructions) ........ | **5** | 8,784 hr |
| 6 | Divide line 4 by line 5. Enter the result as a decimal amount ............ | **6** | |
| 7 | Business percentage. For daycare facilities not used exclusively for business, multiply line 6 by line 3 (enter the result as a percentage). All others, enter the amount from line 3 ► | **7** | 50.00 % |

### Part II  Figure Your Allowable Deduction

| | | | | | |
|---|---|---|---|---|---|
| 8 | Enter the amount from Schedule C, line 29, **plus** any net gain or (loss) derived from the business use of your home and shown on Schedule D or Form 4797. If more than one place of business, see instructions | | **8** | | 222,207. |
| | See Instrs for columns (a) and (b) before completing lines 9-21. | **(a)** Direct expenses | **(b)** Indirect expenses | | |
| 9 | Casualty losses (see instructions) | **9** | | | |
| 10 | Deductible mortgage interest (see instructions) | **10** | 328,011. | | |
| 11 | Real estate taxes (see instructions) | **11** | | | |
| 12 | Add lines 9, 10, and 11 | **12** | 328,011. | | |
| 13 | Multiply line 12, column (b) by line 7 | **13** | 164,006. | | |
| 14 | Add line 12, column (a) and line 13 | | | **14** | 164,006. |
| 15 | Subtract line 14 from line 8. If zero or less, enter -0- | | | **15** | 58,201. |
| 16 | Excess mortgage interest (see instructions) | **16** | | | |
| 17 | Insurance | **17** | | | |
| 18 | Rent | **18** | | | |
| 19 | Repairs and maintenance | **19** | | | |
| 20 | Utilities | **20** | | | |
| 21 | Other expenses (see instrs) | **21** | | | |
| 22 | Add lines 16 through 21 | **22** | | | |
| 23 | Multiply line 22, column (b) by line 7 | **23** | | | |
| 24 | Carryover of operating expenses from 2007 Form 8829, line 42 | **24** | 114,520. | | |
| 25 | Add line 22 column (a), line 23, and line 24 | | | **25** | 114,520. |
| 26 | Allowable operating expenses. Enter the smaller of line 15 or line 25 | | | **26** | 58,201. |
| 27 | Limit on excess casualty losses and depreciation. Subtract line 26 from line 15 | | | **27** | 0. |
| 28 | Excess casualty losses (see instructions) | **28** | | | |
| 29 | Depreciation of your home from line 41 below | **29** | 72,724. | | |
| 30 | Carryover of excess casualty losses and depreciation from 2007 Form 8829, line 43 | **30** | 314,667. | | |
| 31 | Add lines 28 through 30 | | | **31** | 387,391. |
| 32 | Allowable excess casualty losses and depreciation. Enter the smaller of line 27 or line 31 | | | **32** | 0. |
| 33 | Add lines 14, 26, and 32 | | | **33** | 222,207. |
| 34 | Casualty loss portion, if any, from lines 14 and 32. Carry amount to **Form 4684**, Section B | | | **34** | |
| 35 | **Allowable expenses for business use of your home.** Subtract line 34 from line 33. Enter here and on Schedule C, line 30. If your home was used for more than one business, see instructions ► | | | **35** | 222,207. |

### Part III  Depreciation of Your Home

| | | | |
|---|---|---|---|
| 36 | Enter the smaller of your home's adjusted basis or its fair market value (see instructions) | **36** | 5,881,038. |
| 37 | Value of land included on line 36 | **37** | 348,837. |
| 38 | Basis of building. Subtract line 37 from line 36 | **38** | 5,532,201. |
| 39 | Business basis of building. Multiply line 38 by line 7 | **39** | 2,766,101. |
| 40 | Depreciation percentage (see instructions) | **40** | 2.5641 % |
| 41 | Depreciation allowable (see instructions). Multiply line 39 by line 40. Enter here and on line 29 above | **41** | 72,724. |

### Part IV  Carryover of Unallowed Expenses to 2009

| | | | |
|---|---|---|---|
| 42 | Operating expenses. Subtract line 26 from line 25. If less than zero, enter -0- | **42** | 56,319. |
| 43 | Excess casualty losses and depreciation. Subtract line 32 from line 31. If less than zero, enter -0- | **43** | 387,391. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**      FDIA6902  12/24/08      Form **8829** (2008)

[*54]

| Form **8829** | **Expenses for Business Use of Your Home** | OMB No. 1545-0074 |
|---|---|---|
| Department of the Treasury Internal Revenue Service (99) | ► File only with Schedule C (Form 1040). Use a separate Form 8829 for each home you used for business during the year. ► See separate instructions. | **2009** Attachment Sequence No. **66** |

Name(s) of proprietor(s)  THOMAS D CONRAD  |  Your social security number

**Part I  Part of Your Home Used for Business**   CONSULTING

| | | | |
|---|---|---|---|
| 1 | Area used regularly and exclusively for business, regularly for daycare, or for storage of inventory or product samples (see instructions) | 1 | 3,750 |
| 2 | Total area of home | 2 | 7,500 |
| 3 | Divide line 1 by line 2. Enter the result as a percentage | 3 | 50.00 % |
| | For daycare facilities not used exclusively for business go to line 4. All others go to line 7. | | |
| 4 | Multiply days used for daycare during year by hours used per day ........ | 4 |  hr |
| 5 | Total hours available for use during the year (365 days x 24 hours) (see instructions) ........ | 5 | 8,760 hr |
| 6 | Divide line 4 by line 5. Enter the result as a decimal amount | 6 | |
| 7 | Business percentage. For daycare facilities not used exclusively for business, multiply line 6 by line 3 (enter the result as a percentage). All others, enter the amount from line 3 ► | 7 | 50.00 % |

**Part II  Figure Your Allowable Deduction**

| | | (a) Direct expenses | (b) Indirect expenses | | |
|---|---|---|---|---|---|
| 8 | Enter the amount from Schedule C, line 29, plus any net gain or (loss) derived from the business use of your home and shown on Schedule D or Form 4797. If more than one place of business, see instructions | | | 8 | 288,000. |
| | See Instrs for columns (a) and (b) before completing lines 9-21. | | | | |
| 9 | Casualty losses (see instructions) ......... 9 | | | | |
| 10 | Deductible mortgage interest (see instructions) 10 | 40,944. | | | |
| 11 | Real estate taxes (see instructions) 11 | | 42,076. | | |
| 12 | Add lines 9, 10, and 11  12 | 40,944. | 42,076. | | |
| 13 | Multiply line 12, column (b) by line 7  13 | | 21,038. | | |
| 14 | Add line 12, column (a) and line 13 | | | 14 | 61,982. |
| 15 | Subtract line 14 from line 8. If zero or less, enter -0- | | | 15 | 226,018. |
| 16 | Excess mortgage interest (see instructions)  16 | | | | |
| 17 | Insurance  17 | | 3,526. | | |
| 18 | Rent  18 | | | | |
| 19 | Repairs and maintenance  19 | | | | |
| 20 | Utilities  20 | | 7,510. | | |
| 21 | Other expenses (see instrs)  21 | | 61,812. | | |
| 22 | Add lines 16 through 21  22 | | 72,848. | | |
| 23 | Multiply line 22, column (b) by line 7  23 | | 36,424. | | |
| 24 | Carryover of operating expenses from 2008 Form 8829, line 42  24 | | 56,319. | | |
| 25 | Add line 22 column (a), line 23, and line 24 | | | 25 | 92,743. |
| 26 | Allowable operating expenses. Enter the smaller of line 15 or line 25 | | | 26 | 92,743. |
| 27 | Limit on excess casualty losses and depreciation. Subtract line 26 from line 15 | | | 27 | 133,275. |
| 28 | Excess casualty losses (see instructions)  28 | | | | |
| 29 | Depreciation of your home from line 41 below  29 | | 72,724. | | |
| 30 | Carryover of excess casualty losses and depreciation from 2008 Form 8829, line 43  30 | | 387,391. | | |
| 31 | Add lines 28 through 30 | | | 31 | 460,115. |
| 32 | Allowable excess casualty losses and depreciation. Enter the smaller of line 27 or line 31 | | | 32 | 133,275. |
| 33 | Add lines 14, 26, and 32 | | | 33 | 288,000. |
| 34 | Casualty loss portion, if any, from lines 14 and 32. Carry amount to Form 4684, Section B | | | 34 | |
| 35 | Allowable expenses for business use of your home. Subtract line 34 from line 33. Enter here and on Schedule C, line 30. If your home was used for more than one business, see instructions ► | | | 35 | 288,000. |

**Part III  Depreciation of Your Home**

| | | | |
|---|---|---|---|
| 36 | Enter the smaller of your home's adjusted basis or its fair market value (see instructions) | 36 | 5,881,038. |
| 37 | Value of land included on line 36 | 37 | 348,837. |
| 38 | Basis of building. Subtract line 37 from line 36 | 38 | 5,532,201. |
| 39 | Business basis of building. Multiply line 38 by line 7 | 39 | 2,766,101. |
| 40 | Depreciation percentage (see instructions) | 40 | 2.5641 % |
| 41 | Depreciation allowable (see instructions). Multiply line 39 by line 40. Enter here and on line 29 above | 41 | 72,724. |

**Part IV  Carryover of Unallowed Expenses to 2010**

| | | | |
|---|---|---|---|
| 42 | Operating expenses. Subtract line 26 from line 25. If less than zero, enter -0- | 42 | 0. |
| 43 | Excess casualty losses and depreciation. Subtract line 32 from line 31. If less than zero, enter -0- | 43 | 326,840. |

BAA  For Paperwork Reduction Act Notice, see separate instructions.   FDIA6902 06/25/09   Form 8829 (2009)

[*55] Taxpayers calculate their current-year deductions for expenses related to the renting of their personal residences and any carryforward of such expenses from prior years on a worksheet attached to the IRS's instructions to Schedule E. Taxpayers do not attach this worksheet to their filed returns. A copy of this blank worksheet is reproduced below:

**Worksheet 5-1.    Worksheet for Figuring Rental Deductions for a Dwelling Unit Used as a Home**    *Keep for Your Records*

**Use this worksheet only if you answer "yes" to all of the following questions.**
- Did you use the dwelling unit as a home this year? (See *Dwelling Unit Used as a Home.*)
- Did you rent the dwelling unit at a fair rental price 15 days or more this year?
- Is the total of your rental expenses and depreciation more than your rental income?

**PART I.    Rental Use Percentage**

A.  Total days available for rent at fair rental price . . . . . . . . . . . . . . . . . . . . . . . .  A. _____

B.  Total days available for rent (line A) but not rented . . . . . . . . . . . . . . . . . . . .  B. _____

C.  **Total days of rental use.** Subtract line B from line A . . . . . . . . . . . . . . . . . . . . . . .  C. _____

D.  **Total days of personal use** (including days rented at less than fair rental price) . . . . . . . . .  D. _____

E.  **Total use of the property.** Add lines C and D . . . . . . . . . . . . . . . . . . . . . . .  E. _____

F.  **Percentage of expenses allowed for rental.** Divide line C by line E . . . . . . . . . . . . . . . .  F. _____

**PART II.    Allowable Rental Expenses**

1.  Enter rents received . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1. _____

2a. Enter the rental portion of deductible home mortgage interest and qualified mortgage insurance premiums (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2a. _____
  b.  Enter the rental portion of real estate taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  b. _____
  c.  Enter the rental portion of deductible casualty and theft losses (see instructions) . . . . . . . . .  c. _____
  d.  Enter direct rental expenses (see instructions) . . . . . . . . . . . . . . . . . . . . . .  d. _____
  e.  **Fully deductible rental expenses.** Add lines 2a–2d. Enter here and on the appropriate lines on Schedule E (see instructions) . . . . . . . . . . . . . . . . . . . . . .  2e. _____

3.  Subtract line 2e from line 1. If zero or less, enter -0- . . . . . . . . . . . . . . . . . . . . . . . . .  3. _____

4a. Enter the rental portion of expenses directly related to operating or maintaining the dwelling unit (such as repairs, insurance, and utilities) . . . . . . . . . . . . . . . . . . . . . .  4a. _____
  b.  Enter the rental portion of excess mortgage interest and qualified mortgage insurance premiums (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  b. _____
  c.  Carryover of operating expenses from 2007 worksheet . . . . . . . . . . . . . . . . . . . . . . . .  c. _____
  d.  Add lines 4a–4c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  d. _____
  e.  **Allowable expenses.** Enter the **smaller** of line 3 or line 4d (see instructions) . . . . . . . . . . . . . . . . . . . . . .  4e. _____

5.  Subtract line 4e from line 3. If zero or less, enter -0- . . . . . . . . . . . . . . . . . . . . . . . . .  5. _____

6a. Enter the rental portion of excess casualty and theft losses (see instructions) . . . . . . . . . . .  6a. _____
  b.  Enter the rental portion of depreciation of the dwelling unit . . . . . . . . . . . . . . . . . . . . . .  b. _____
  c.  Carryover of excess casualty losses and depreciation from 2007 worksheet . . . . . . . . . . . .  c. _____
  d.  Add lines 6a–6c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  d. _____
  e.  **Allowable excess casualty and theft losses and depreciation.** Enter the **smaller** of line 5 or line 6d (see instructions) . . . . . . . . . . . . . . . . . . . . . .  6e. _____

**PART III.    Carryover of Unallowed Expenses to Next Year**

7a. **Operating expenses to be carried over to next year.** Subtract line 4e from line 4d . . . . . . . . . . . . . . . . . . .  7a. _____
  b.  **Excess casualty and theft losses and depreciation to be carried over to next year.** Subtract line 6e from line 6d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  b. _____

I.R.S. Pub. 527, Residential Real Property (Including Rental of Vacation Homes) 26 (2008).

Section 1401 imposes a tax "on self-employment income . . . for [the] taxable year." § 1401(a). "In the case of a husband and wife filing a joint return . . . the [self-employment tax] shall not be computed on the

**[\*56]** aggregate income but shall be the sum of the taxes computed . . . on the separate self-employment income of each spouse." § 6017; *see also* Treas. Reg. § 1.6017-1(b)(1) ("In the case of a husband and wife filing a joint return . . . the tax on self-employment income is computed on the separate self-employment income of each spouse, and not on the aggregate of the two amounts."). Both spouses, as joint-return filers, are jointly liable for both self-employment taxes. § 6017. Section 1402(b) defines "self-employment income" as "the net earnings from self-employment derived by an individual," which, in turn, is defined by section 1402(a) as "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business." Section 1402(c)(2) defines a "trade or business" as not including income earned by the taxpayer for "the performance of service by an individual as an employee." Self-employment income thus includes an independent contractor's personal-services income. Treas. Reg. § 1.1402(a)-1(a)(1). However, section 1402(a) provides that "net earnings from self-employment" do not include income earned by taxpayers through "rentals from real estate . . . unless such rentals are received in the course of a trade or business as a real estate dealer." § 1402(a)(1).

A.      *2008*

The table below shows the parties' positions on the 2008 deductions related to the condominium and our conclusions as to these deductions. Column 2 states the position the Conrads took on their 2008 tax return. Column 3 states the IRS's position in its notice of deficiency, while column 4 states the IRS's primary position in litigation. Column 5 states the IRS's alternative position in litigation. Finally, column 6 states our holding on the deductions for 2008.

**[*57]**

| | The Conrads' 2008 return | Notice of deficiency | The IRS's primary litigating position | The IRS's alternative litigating position | The Court's conclusions |
|---|---|---|---|---|---|
| Gross income from professional services under Prop. Treas. Reg. § 1.280A-2(*i*)(2) | $222,207 | $222,207 | $222,207 | $222,207 | $222,207 |
| Total expenditures not allocable to business use of condo. Under Prop. Treas. Reg. § 1.280A-2(*i*)(2)(iii) | 0 | 0 | 0 | 0 | 0 |
| Gross income derived from business use of condo. Under Prop. Treas. Reg. § 1.280A-2(*i*)(2)(iii) | 222,207 | 222,207 | 222,207 | 222,207 | 222,207 |
| Deductions under Prop. Treas. Reg. § 1.280A-2(*i*)(5)(i) | 164,006 | 0 | 0 | 0 | 0 |
| Amount allowable | 164,006 | 0 | 0 | 0 | 0 |
| Limit on further deductions | 58,201 | 222,207 | 222,207 | 222,207 | 222,207 |
| Deductions under Prop. Treas. Reg. § 1.280A-2(*i*)(5)(ii) | 114,520 | 0 | 0 | 0 | 0 |
| Amount allowable | 58,201 | 0 | 0 | 0 | 0 |
| Limit on further deductions | 0 | 222,207 | 222,207 | 222,207 | 222,207 |
| Deductions under Prop. Treas. Reg. § 1.280A-2(*i*)(5)(iii) | 387,391 | 0 | 0 | 0 | 0 |
| Amount allowable | 0 | 0 | 0 | 0 | 0 |
| Disallowed Prop. Treas. Reg. § 1.280A-2(*i*)(5)(ii) deductions (carryover to 2009) | 56,319 | 0 | 0 | 0 | 0 |
| Disallowed Prop. Treas. Reg. § 1.280A-2(*i*)(5)(iii) deductions (carryover to 2009) | 387,391 | 0 | 0 | 0 | 0 |
| | | | | | |
| Gross income from rental use under Prop. Treas. Reg. § 1.280A-3(d)(2) | $144,000 | $144,000 | $144,000 | $144,000 | $144,000 |
| Reduction for expenditures not allocable to rental use of condo. Under Prop. Treas. Reg. § 1.280A-3(d)(2) | 0 | 0 | 0 | 0 | 0 |
| Gross income from rental use under Prop. Treas. Reg. § 1.280A-3(d)(2) after reduction | 144,000 | 144,000 | 144,000 | 144,000 | 144,000 |
| Deductions under Prop. Treas. Reg. § 1.280A-3(d)(3)(i) | 0 | 18,443 | 0 | 164,005 | 164,005 |
| Amount allowable | 0 | 18,443 | 0 | 144,000 | 144,000 |
| Limit on further deductions | 144,000 | 125,557 | 144,000 | 0 | 0 |
| Deductions under Prop. Treas. Reg. § 1.280A-3(d)(3)(ii) | 0 | 0 | 0 | 0 | 114,520 |
| Amount allowable | 0 | 0 | 0 | 0 | 0 |
| Limit on further deductions | 144,000 | 125,557 | 144,000 | 0 | 0 |
| Deductions under Prop. Treas. Reg. § 1.280A-3(d)(3)(iii) | 0 | 0 | 0 | 0 | 387,391 |
| Amount allowable | 0 | 0 | 0 | 0 | 0 |
| Disallowed Prop. Treas. Reg. § 1.280A-3(d)(3)(ii) deductions (carryover to 2009) | 0 | 0 | 0 | 0 | 114,520 |
| Disallowed Prop. Treas. Reg. § 1.280A-3(d)(3)(iii) deductions (carryover to 2009) | 0 | 0 | 0 | 0 | 387,391 |
| | | | | | |
| Schedule A – mortgage interest | $216,556 | $216,556 | $328,010 | $184,010 | $184,010 |

The top 13 rows of the table correspond to the method used in Proposed Treasury Regulation § 1.280A-2 for applying section 280A to a dwelling unit partly used as an office and partly used as the taxpayer's residence. *See id*. para. (*i*). The next 13 rows of the table correspond to the method used in Proposed Treasury Regulation § 1.280A-3 for applying section 280A to a dwelling unit partly used for rental activity and partly used as the taxpayer's residence. *See id*. para. (d).

Section 280A(a) disallows all deductions "with respect to use of a dwelling unit which is used by the taxpayer during the taxable year as a residence." The Conrads' condominium is a dwelling unit. *See* § 280A(f)(1)(A) (providing that a condominium is considered a dwelling unit). The condominium is the Conrads' residence for 2008 because "the number of days during" which the Conrads used the condominium for personal purposes was 366, which is greater than the greater of (1) 14 days or (2) 10% of the days the condominium was rented at fair market value (with any day of personal use not counting as a day the

[*58] condominium was rented at fair market value). *See* § 280A(d)(1). Therefore, under section 280A(a), no deductions are allowed with respect to any use of the Conrads' condominium for both the personal and rental portions, unless the deductions fall under exceptions provided in section 280A. Section 280A(c)(1) exempts from section 280A(a) those expenses allocable to the portion of the dwelling unit used for the taxpayer's business (under certain conditions). Section 280A(c)(3) exempts from section 280A(a) those expenses attributable to renting out the dwelling unit. Both types of exempted expenses are subject to the deductibility limit of section 280A(c)(5).

1.      *The Conrads' 2008 tax return*

The Conrads filed Form 8829 on which Dr. Conrad claimed condominium deductions purportedly related to his professional services. The format of the Form 8829 reflects the interpretation of the section 280A(c)(5) limitation by Proposed Treasury Regulation § 1.280A-2 with respect to residences used for the taxpayer's business. The Conrads also reported the $144,000 of rental income they received from FMC on their Schedule E. However, they did not report any deductions related to their condominium on their Schedule E. That is, they did not report that the expenses of the condominium were allocable to the rental use of the condominium. In litigation Dr. Conrad does not suggest that the expenses of the condominium were allocable to the rental of the condominium to FMC. As we have explained, Dr. Conrad instead argues solely that these deductions were allocable to his professional services performed for FMC.

For 2008 line 13 of Dr. Conrad's Form 8829 reported a deduction of $164,006 of mortgage interest purportedly related to Dr. Conrad's professional services. Mortgage interest is deductible whether or not the residence is used in Dr. Conrad's sole proprietorship. *See* §§ 163(a), (h)(2)(D), 280A(b). The deduction for mortgage interest that is allocable to a taxpayer's business activities corresponds to the first category of Proposed Treasury Regulation § 1.280A-2(*i*)(5), which is Proposed Treasury Regulation § 1.280A-2(*i*)(5)(i). The deduction is shown in the table above in the row titled "Deductions under Prop. Treas. Reg. § 1.280A-2(*i*)(5)(i)."

Line 24 of Dr. Conrad's Form 8829 reported a $114,520 operating-expense carryforward from 2007. The Form 8829 did not claim deductions for any operating expenses paid during 2008. Form 8829 is designed such that line 24 corresponds to the second expense category

**[\*59]** of Proposed Treasury Regulation § 1.280A-2(*i*)(5), which is Proposed Treasury Regulation § 1.280A-2(*i*)(5)(ii). The $114,520 carryforward is listed in the table above in the row titled "Deductions under Prop. Treas. Reg. § 1.280A-2(*i*)(5)(ii)."

Finally, Dr. Conrad's Form 8829 on line 29 reported $72,724 of depreciation for 2008 and on line 30 reported $314,667 of depreciation-and-excess-casualty-loss carryforwards from the Conrads' 2007 return. Lines 29 and 30 correspond to the third category of expenses governed by Proposed Treasury Regulation § 1.280A-2(*i*)(5), which is Proposed Treasury Regulation § 1.280A-2(*i*)(5)(iii). The amounts reported on these two lines total $387,391 and are shown in the table above in the row titled "Deductions under Prop. Treas. Reg. § 1.280A-2(*i*)(5)(iii)."

In accordance with the ordering rules from Proposed Treasury Regulation § 1.280A-2(*i*)(5) (which the Form 8829 incorporates), the Conrads first deducted all their Proposed Treasury Regulation § 1.280A-2(*i*)(5)(i) expenses ($164,006) against Dr. Conrad's gross income from professional services ($222,207). After doing so, the Conrads were left with $58,201 of income that could be offset with other deductions. The $58,201 was reported on line 15 of Dr. Conrad's Form 8829. The Conrads then used $58,201 of Dr. Conrad's Proposed Treasury Regulation § 1.280A-2(*i*)(5)(ii) expenses to offset Dr. Conrad's remaining income. The Conrads carried forward $56,319 of Proposed Treasury Regulation § 1.280A-2(*i*)(5)(ii) expenses for use in future years. The $56,319 was reported on line 42 of the Form 8829. In addition, the Conrads also carried forward the $387,391 of Proposed Treasury Regulation § 1.280A-2(*i*)(5)(iii) expenses for use in future years. The $387,391 was reported on line 43 of the Form 8829.

2.    *The notice of deficiency*

The notice of deficiency reflected the IRS's position that the condominium was not exclusively used as Dr. Conrad's principal place of business and that therefore all the expenses related to the condominium were not exempted from the disallowance of section 280A(a) by section 280A(c)(1)(A). The notice of deficiency also implicitly disallowed the two types of carryforwards from 2007 reported by the Conrads on Dr. Conrad's Form 8829 because it did not incorporate an adjustment for their claimed carryforwards even though Dr. Conrad reported professional-services income during 2008. *See* § 280A(c)(5) (flush language).

**[*60]** The notice of deficiency did not disallow the $216,556 mortgage interest deduction the Conrads claimed as an itemized deduction on their Schedule A.

The notice of deficiency allowed the Conrads an $18,443 deduction on their Schedule E. The notice of deficiency stated that the $18,443 deduction was the "amount . . . for ordinary and necessary business purposes and that this amount qualifies under the provisions of the . . . Code." However, the notice of deficiency did not further explain what specific expenses the deduction corresponded to or whether the deduction related to the renting of the Conrads' condominium to FMC.

### 3. *The IRS's primary litigating position*

On brief the IRS explains the $18,443 allowance made by the notice of deficiency as follows:

> This $18,443.00 was [the IRS's] allowance for [the Conrads'] Business Use of Home deduction. The $18,443.00 was permitted as a Schedule E deduction because [the Conrads] reported rental income from [FMC] to themselves for the company's use of their home for business in the amount of $144,000.00 on their Schedule E for the 2008 tax year.

Having thus acknowledged that the notice of deficiency allowed the deduction, the IRS's brief makes the following statement:

> One hundred percent of [the Conrads'] mortgage interest deduction for both years at issue rightfully belongs on [the Conrads'] Schedule A for the 2008 and 2009 tax years. [The Conrads] have not proven their Business Use of Home deductions taken are permissible, and as such the mortgage interest deduction should only appear on their Schedule A for both [2008 and 2009].

We interpret this statement to be a disavowal of the allowance of the $18,443 deduction as a Schedule E deduction by the notice of deficiency. Therefore, the IRS's primary position, which is stated in its posttrial briefs, is that 100% of the mortgage interest, which is $328,010, is allowable as a Schedule A deduction (i.e., as an itemized deduction), rather than as a Schedule E deduction (i.e., as a rental-expense deduction).

[*61]    4.    *The IRS's alternative litigating position*

Column 5 of the table illustrates the IRS's alternative position, which is that the deductions allocable to the rental use of the condominium are allowable only to the extent of the section 280A(c)(5) limitation and that the limitation is the amount of rent received by the Conrads from FMC. In the IRS's (alternative) view, this limitation works as follows: "In this case, the [Conrads'] Business Use of Home deduction would be limited to the rents they received - $144,000.00 for 2008 . . . ." This sentence reflects the view that the gross income in the section 280A(c)(5) limitation is the rents received, not Dr. Conrad's professional-services income. This sentence also reflects the view that section 280A(c)(5) should be applied in accordance with the interpretation of that provision found in Proposed Treasury Regulation § 1.280A-3(d)(3)(i). Under that interpretation the mortgage interest and taxes allocable to rental use are deductible as rental expenses only to the extent of gross rental income. I.R.S. Publication 527, *supra*, at 23–27, adopts a different approach, under which the mortgage interest and taxes allocable to rental use are deductible as rental expenses even in amounts exceeding gross rental income.

5.    *The Court's conclusion*

We conclude that the nonpersonal portion of the condominium was rented by FMC from the Conrads, and FMC in turn permitted Dr. Conrad and other workers to use that portion of the condominium. Therefore, as column 6 in the table above shows, we agree with the IRS's alternative position. We disagree with the Conrads' reporting position that the nonpersonal portion of the condominium was used by Dr. Conrad's sole proprietorship, and we therefore reject the Conrads' reporting position. The expenses of the Conrads with respect to that portion of the condominium were thus rental expenses of the Conrads rather than business expenses of Dr. Conrad's sole proprietorship. *See* § 280A(c)(3). We will therefore apply the ordering rules provided in Proposed Treasury Regulation § 1.280A-3(d)(3) rather than those in Proposed Treasury Regulation § 1.280A-2(*i*)(5) to determine the Conrads' deductions for 2008.

Dr. Conrad does not contend that Proposed Treasury Regulation § 1.280A-3(d)(3) should not be used to calculate the section 280A(c)(5) limitation, he does not argue that I.R.S. Publication 527, *supra*, at 23–27, should be used to calculate the section 280A(c)(5) limitation, and he does not argue that the Conrads should be allowed to deduct

[*62] mortgage interest as a rental expense in excess of the rent they received from FMC. We will not make these arguments on his behalf. *See Feigh*, 152 T.C. at 277.

In our application of the section 280A(c)(5) limit for 2008, we include the $114,520 operating-expense carryforward reported by the Conrads on their 2008 return. The IRS's critique of the Conrads' computations used in their tax reporting, i.e., that the nonpersonal portion of the condominium was rented to FMC rather than used by Dr. Conrad's sole proprietorship, a critique with which we agree, suggests that the $114,520 operating-expense deductions carried forward from 2007 are not overstated. The Conrads likely used Dr. Conrad's 2007 professional-services income as their section 280A(c)(5) limit rather than the 2007 rents received from FMC. The 2007 professional-services income was likely greater than the 2007 rents received (as it was in 2008). In our computation of the section 280A(c)(5) limit for 2008, we include the $314,667 carryforward of depreciation and excess casualty loss expenses from 2007 for similar reasons. We also include the $328,010 in deductible mortgage interest the Conrads paid during 2008 ($164,005 of which was allocable to rental use). We also include $72,724 of depreciation for 2008 reported on Dr. Conrad's Form 8829. The IRS does not challenge the accuracy of this amount. It argues only that the nonpersonal part of the condominium was used to rent to FMC (alternative position) and that the condominium was not used in Dr. Conrad's sole proprietorship (primary position).

For 2008 the Conrads paid $328,010 of mortgage interest. On Dr. Conrad's Form 8829 the Conrads divided the expenses related to the condominium and the house evenly between the portions of the residences used by FMC and the portions used by them personally. The IRS has not argued that we should adjust this allocation method. Therefore, we will accept the Conrads' method and will divide the mortgage interest related to the condominium equally between their personal and rental activities. *See Feigh*, 152 T.C. at 277.

Half of the Conrads' mortgage interest, $164,005, is attributable to rental use. This half is deductible as an above-the-line rental expense only to the extent of the $144,000 of rental income FMC paid to the Conrads because of the limit imposed by Proposed Treasury Regulation § 1.280A-3(d)(3)(i). The excess, $20,005, is allowable as a Schedule A deduction. *See* §§ 163(a), (h)(2)(D), 280A(b); *Coffman v. Commissioner*, T.C. Memo. 2000-7, slip op. at 11 (concluding that when the gross-income limitation of section 280A(c)(5) prevents the taxpayers from

**[\*63]** deducting a portion of their mortgage interest as a business deduction, the portion of the mortgage interest disallowed as a business deduction is an itemized deduction for the year at issue). In addition, the other half of the $328,010 of mortgage interest, which is attributable to the Conrads' personal use of the condominium, is allowable as a Schedule A deduction. *See* §§ 163(a), (h)(2)(D), 280A(b).

Therefore, we hold that for 2008 $144,000 of mortgage interest is deductible as an above-the-line rental-expense deduction. *See* §§ 62(a)(4), 212(2), 280A(c)(3). Also, another $184,010 of mortgage interest is an itemized deduction (consisting of (1) the $164,005 of mortgage interest attributable to the personal portion of the condominium and (2) the $20,005 of the mortgage interest attributable to the rental portion of the condominium but that cannot be deducted as a rental expense for 2008 because of section 280A(c)(5) and Proposed Treasury Regulation § 1.280A-3(d)(3)(i)).[40] *See* §§ 163(a), (h)(2)(D), 280A(b).

As discussed *supra* OPINION, Part III.A.1, the Conrads deducted $58,201 of operating-expense carryforwards on Dr. Conrad's Form 8829 for 2008. The Conrads also carried forward an additional $56,319 of operating-expense deductions into 2009. After the allowance of their deduction for mortgage interest allocable to their rental activity, the Conrads may not deduct any additional residence expenses against their rental income. *See* § 280A(c)(5); Prop. Treas. Reg. § 1.280A-3(d)(3)(ii). Therefore, we conclude that the Conrads must carry forward the $114,520 of operating expenses (which is the sum of $58,201 and $56,319) to 2009.

As discussed *supra* OPINION, Part III.A.1, the Conrads claimed a current-year depreciation deduction of $72,724 on Dr. Conrad's Form 8829 for the condominium and a $314,667 depreciation-and-excess casualty-loss carryforward from 2007. The Conrads did not deduct either of these amounts on Dr. Conrad's Form 8829 but instead carried forward the deductions to 2009. We agree with the Conrads that the carryforwards are appropriate. Thus, the Conrads must carry forward

---

[40] The notice of deficiency did not disallow the $216,556 mortgage interest expense the Conrads claimed as an itemized deduction (i.e., a Schedule A deduction). Furthermore, the IRS's opening brief contends that all of the Conrads' $328,010 of mortgage interest should be claimed on their Schedule A. Thus, we conclude that the IRS does not dispute that the mortgage interest on the condominium is "qualified residence interest." *See* § 163(h)(3)(A); *Feigh*, 152 T.C. at 277. Qualified residence interest is exempt from section 280A(a) by section 280A(b).

**[\*64]** $387,391 of depreciation and excess casualty loss expenses (which is the sum of $72,724 and $314,667) to 2009.

Having determined the allowable deductions under section 280A(c)(3) and (5) ($144,000), our final step is to determine whether any other provision in section 280A further limits the Conrads' deductions. During 2008 and 2009 the Conrads' extended family used the portions of the condominium rented to FMC for personal purposes while visiting the Conrads. This personal use is attributed to the Conrads. *See* § 280A(d)(2)(A) (attributing personal use of the residence by the taxpayer's family to the taxpayer). Because we conclude that the Conrads used their residences for rental activity instead of as a home office in Dr. Conrad's business, the Conrads' personal use of the rented portions of the condominium does not result in the disallowance of any of the Conrads' deductions for 2008. The Code provides that taxpayers cannot deduct any residence expenses as business expenses when the taxpayers also use the business portion of the residence for personal activities. *See* § 280A(c)(1); H.R. Rep. No. 94-658, at 161 (1975), *as reprinted in* 1976-3 C.B. (Vol. 2) 695, 853 ("The use of a portion of a dwelling unit for both personal purposes and for the carrying on of a trade or business does not meet [the section 280A(c)(1)] exclusive use test."); S. Rep. No. 94-938, at 148 (1976), *as reprinted in* 1976-3 C.B. (Vol. 3) 49, 186 (same); *Perry v. Commissioner*, T.C. Memo. 1996-194, slip op. at 14–15 ("The use of a portion of a dwelling unit for both personal and business purposes does not meet the exclusive use requirement of section 280A(c)(1)."). However, no such exclusivity restriction relates to section 280A(c)(3). *See* § 280A(c)(1)(A) ("Subsection (a) shall not apply to any item to the extent such item is allocable to a portion of the dwelling unit which is exclusively used on a regular basis as the principal place of business for any trade or business of the taxpayer . . . ."); § 280A(c)(3) ("Subsection (a) shall not apply to any item which is attributable to the rental of the dwelling unit or portion thereof . . . ."); *Francisco v. Commissioner*, 119 T.C. 317, 323 (2002) ("We can reasonably assume Congress intentionally chose different words in closely related statutory provisions to produce a different meaning."), *aff'd*, 370 F.3d 1228 (D.C. Cir. 2004). Therefore, the Conrads' personal use of the rented portion of the condominium does not prevent them from deducting any of their expenses.

A taxpayer who has expenses attributable to renting out a residence may find the deductions attributable to such expenses limited by section 280A(e)(1). The IRS does not suggest that this provision limits the deductions for the expenses attributable to the Conrads' rental of

[*65] the condominium to FMC. We therefore need not address this potential argument. *See Feigh*, 152 T.C. at 277.

Section 280A(c)(6) bars deductions otherwise allowed under section 280A(c)(3) when (1) an employee rents part or all of the employee's personal residence to his or her employer (provided the rental expenses relate to part or all of the personal residence rented to the employer) and (2) the employee performs services for the employer within the personal residence. The IRS cited section 280A(c)(6) in its Pre-trial Memorandum as support for disallowing the deductions related to the condominium; however, the IRS then failed to assert any argument under section 280A(c)(6) in its briefs. The IRS has thus abandoned any argument regarding section 280A(c)(6). *See Amazon.com, Inc.*, 148 T.C. at 220. Therefore, we hold that section 280A(c)(6) does not bar any of the Conrads' deductions for 2008.[41]

In sum, we hold that for 2008 the Conrads may deduct (1) $144,000 of mortgage interest as an above-the-line rental-expense deduction and (2) $184,010 of mortgage interest as an itemized deduction. There is a carryforward of (1) $114,520 of operating expenses and (2) $387,391 of depreciation and excess casualty loss expenses to 2009.[42]

---

[41] Although the text of section 280A(c)(6) refers to "employees" and "employers," parts of the legislative history claim that section 280A(c)(6) was intended to also apply to independent contractors such as the Conrads. *See* H.R. Rep. No. 99-426, at 134 (1985), *as reprinted in* 1986-3 C.B. (Vol. 2) 1, 134 (stating that for section 280A(c)(6), "an individual who is an independent contractor is treated as an employee, and the party for whom such individual is performing services is treated as an employer"); S. Rep. No. 99-313, at 84 (1986), *as reprinted in* 1986-3 C.B. (Vol. 3) 1, 84 (same). Because we conclude that the IRS has waived any argument under section 280A(c)(6), we need not decide whether the legislative history is enough to overcome the plain language in section 280A(c)(6) that the provision applies to "employees."

[42] The Conrads did not report that the activities of Dr. Conrad's sole proprietorship resulted in any self-employment income. That is because Dr. Conrad's Schedule C reported that his $222,207 of professional-services income was offset by $222,207 of residence expenses purportedly related to the use of the condominium for his professional-services sole proprietorship. Because in our view these expenses related not to his sole proprietorship but to rental use, the Conrads underreported Dr. Conrad's self-employment income by $222,207 by improperly deducting $222,207 against his professional-services income.

**[*66]** B.    *2009*

The table below shows the parties' positions on the 2009 deductions and our conclusions as to these deductions. Column 2 states the position the Conrads took on their 2009 tax return. Column 3 states the IRS's position in its notice of deficiency. Column 4 states the IRS's primary position in litigation, while column 5 states the IRS's alternative position in litigation. Finally, column 6 states our holding on the deductions for 2009.

| | The Conrads' 2009 return | Notice of deficiency | The IRS's primary litigating position | The IRS's alternative litigating position | The Court's conclusions |
|---|---|---|---|---|---|
| Dr. Conrad's professional services | | | | | |
| Gross income from professional services under Prop. Treas. Reg. § 1.280A-2(*i*)(2) | $288,000 | $288,000 | $288,000 | $288,000 | $183,667 |
| Total expenditures not allocable to business use of residences under Prop. Treas. Reg. § 1.280A-2(*i*)(2)(iii) | 0 | 0 | 0 | 0 | 0 |
| Gross income derived from business use of residences under Prop. Treas. Reg. § 1.280A-2(*i*)(2)(iii). | 288,000 | 288,000 | 288,000 | 288,000 | 183,667 |
| Dr. Conrad's deductions under Prop. Treas. Reg. § 1.280A-2(*i*)(5)(i) | 61,982 | 0 | 0 | 0 | 0 |
| Amount allowable | 61,982 | 0 | 0 | 0 | 0 |
| Limit on further deductions | 226,018 | 288,000 | 288,000 | 288,000 | 183,667 |
| Dr. Conrad's deductions under Prop. Treas. Reg. § 1.280A-2(*i*)(5)(ii) | 92,743 | 0 | 0 | 0 | 0 |
| Amount allowable | 92,743 | 0 | 0 | 0 | 0 |
| Limit on further deductions | 133,275 | 288,000 | 288,000 | 288,000 | 183,667 |
| Dr. Conrad's deductions under Prop. Treas. Reg. § 1.280A-2(*i*)(5)(iii) | 460,115 | 0 | 0 | 0 | 0 |
| Amount allowable | 133,275 | 0 | 0 | 0 | 0 |
| Dr. Conrad's disallowed Prop. Treas. Reg. § 1.280A-2(*i*)(5)(ii) deductions (carryover to 2010) | 0 | 0 | 0 | 0 | 0 |
| Dr. Conrad's disallowed Prop. Treas. Reg. § 1.280A-2(*i*)(5)(iii) deductions (carryover to 2010) | 326,840 | 0 | 0 | 0 | 0 |
| | | | | | |
| Mrs. Conrad's accounting services | | | | | |
| Gross income from accounting services under Prop. Treas. Reg. § 1.280A-2(*i*)(2) | $81,267 | $81,267 | $81,267 | $81,267 | $81,267 |
| Total expenditures not allocable to business use of residences under Prop. Treas. Reg. § 1.280A-2(*i*)(2)(iii) | 0 | 0 | 0 | 0 | 0 |
| Gross income derived from business use of residences under Prop. Treas. Reg. § 1.280A-2(*i*)(2)(iii) | 81,267 | 81,267 | 81,267 | 81,267 | 81,267 |
| Mrs. Conrad's deductions under Prop. Treas. Reg. § 1.280A-2(*i*)(5)(i) | 0 | 0 | 0 | 0 | 0 |
| Amount allowable | 0 | 0 | 0 | 0 | 0 |
| Limit on further deductions | 81,267 | 81,267 | 81,267 | 81,267 | 81,267 |
| Mrs. Conrad's deductions under Prop. Treas. Reg. § 1.280A-2(*i*)(5)(ii) | 91,742 | 3,885 | 3,885 | 3,885 | 0 |
| Amount allowable | 91,742 | 3,885 | 3,885 | 3,885 | 0 |
| Limit on further deductions | 0 | 77,382 | 77,382 | 77,382 | 81,267 |
| Mrs. Conrad's deductions under Prop. Treas. Reg. § 1.280A-2(*i*)(5)(iii) | 0 | 0 | 0 | 0 | 0 |
| Amount allowable | 0 | 0 | 0 | 0 | 0 |
| Mrs. Conrad's disallowed Prop. Treas. Reg. § 1.280A-2(*i*)(5)(ii) deductions (carryover to 2010) | 0 | 0 | 0 | 0 | 0 |
| Mrs. Conrad's disallowed Prop. Treas. Reg. § 1.280A-2(*i*)(5)(iii) deductions (carryover to 2010) | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| Gross income from rental use under Prop. Treas. Reg. § 1.280A-3(d)(2) before reductions | $0 | $0 | $104,333 | $104,333 | $104,333 |
| Reduction for expenditures not allocable to rental use of condo under Prop. Treas. Reg. § 1.280A-3(d)(2) | 0 | 0 | 0 | 0 | 0 |
| Gross income from rental use under Prop. Treas. Reg. § 1.280A-3(d)(2) after reduction | 0 | 0 | 104,333 | 104,333 | 104,333 |
| Deductions under Prop. Treas. Reg. § 1.280A-3(d)(3)(i) | 0 | 0 | 0 | 61,983 | 61,983 |
| Amount allowable | 0 | 0 | 0 | 61,983 | 61,983 |
| Limit on further deductions | 0 | 0 | 104,333 | 42,350 | 42,350 |
| Deductions under Prop. Treas. Reg. § 1.280A-3(d)(3)(ii) | 0 | 0 | 0 | 70,160 | 184,680 |
| Amount allowable | 0 | 0 | 0 | 38,465 | 42,350 |
| Limit on further deductions | 0 | 0 | 104,333 | 0 | 0 |
| Deductions under Prop. Treas. Reg. § 1.280A-3(d)(3)(iii) | 0 | 0 | 0 | 0 | 460,115 |
| Amount allowable | 0 | 0 | 0 | 0 | 0 |
| Disallowed Prop. Treas. Reg. § 1.280A-3(d)(3)(ii) deductions (carryover to 2010) | 0 | 0 | 0 | 27,810 | 142,330 |
| Disallowed Prop. Treas. Reg. § 1.280A-3(d)(3)(iii) deductions (carryover to 2010) | 0 | 0 | 0 | 0 | 460,115 |
| | | | | | |
| Schedule A – mortgage interest plus real estate taxes | $102,927 | $123,965 | $123,965 | $61,983 | $61,983 |

**[\*67]** The top 28 rows of the table for 2009 correspond to the method used in Proposed Treasury Regulation § 1.280A-2 for applying section 280A to a dwelling unit partly used as an office and partly used as the taxpayer's residence. *See id*. para. (*i*). The next 13 rows of the table correspond to the method used in Proposed Treasury Regulation § 1.280A-3 for applying section 280A to a dwelling unit partly used for rental activity and partly used as the taxpayer's residence. *See id*. para. (d).

One major difference between the 2008 and 2009 tables is that the 2009 table includes a second section corresponding to Proposed Treasury Regulation § 1.280A-2. This is because the Conrads deducted some of the residence expenses on Mrs. Conrad's 2009 Schedule C. The Conrads did not report these deductions as business-use-of-home expenses. (They reported the deductions directly on Mrs. Conrad's Schedule C rather than indirectly through Form 8829.) The Schedule C for Mrs. Conrad reported deductions of $48,542 of condominium fees (the actual condominium fees paid by the Conrads were only $24,271) and $43,200 for rent for the house. The notice of deficiency determined that the $48,542 and $43,200 deductions should be disallowed because the corresponding expenses do not meet the requirements of section 162(a).[43] Because we believe that these expenses are attributable to the rental use of the residence (in reduced amounts, $12,136 of condominium fees and $21,600 of rent expense for the house) and are therefore deductible under section 212(2), we reject the IRS's argument that the deductions should be disallowed for their failure to meet the requirements of section 162(a). However, the IRS's argument that section 280A limits the expenses of the condominium and the house should also be considered. The $12,136 of condominium fees allocable to the rental portion of the condominium and the $21,600 of rent expense allocable to the rental portion of the house are the expenses of the Conrads' residences under section 280A(a). Therefore, we will analyze the deductions for condominium fees for the condominium and rent for

---

[43] Mrs. Conrad reported the deduction for condominium fees for the condominium as an "office expense" and the deduction for rent for the house as "[r]ent or lease" of "[v]ehicles, machinery, and equipment." The IRS did not realize that these two expenses were residence expenses until Dr. Conrad's testimony at trial. It is therefore understandable why the notice of deficiency did not disallow Mrs. Conrad's Schedule C deductions for condominium fees for the condominium and rent for the house under section 280A.

[*68] the house under section 280A in order to determine whether the Conrads can deduct these expenses.[44]

### 1. *The Conrads' 2009 rental income from FMC*

The first numerical row of the table is for Dr. Conrad's gross income for professional services. Dr. Conrad's Schedule C, the notice of deficiency, and the IRS's primary and alternative litigating positions all embrace the view that Dr. Conrad earned $288,000 of professional-services income during 2009. However, Dr. Conrad testified at trial that the $104,333 of rent from FMC was reported as part of the $288,000 reported as professional-services income on his Schedule C. This testimony was credible. We consequently find that the $288,000 reported as compensation for Dr. Conrad's professional services was actually composed of (1) $104,333 of rental payments from FMC and (2) $183,667 (i.e., $288,000 minus $104,333) of compensation from FMC for Dr. Conrad's professional services.

Dr. Conrad's income earned as president of FMC ($183,667) and Mrs. Conrad's income earned for accounting services to FMC ($81,267) are both subject to self-employment tax. The Conrads' rental income from FMC, however, is not subject to self-employment tax because the Conrads are not "real estate dealers." *See* § 1402(a). Therefore, the Conrads overreported Dr. Conrad's self-employment income by reporting that the $104,333 of rents received was income of his sole proprietorship. The parties' Rule 155 computations will determine how much self-employment tax the Conrads owe. When making these calculations, the parties should exclude the $104,333 of rental income from Dr. Conrad's self-employment income.

### 2. *Residence deductions*

We now turn to the residence deductions the Conrads claimed for 2009. Section 280A(a) disallows all deductions "with respect to use of a dwelling unit which is used by the taxpayer during the taxable year as a residence." The condominium and the house are dwelling units. *See*

---

[44] The IRS did not argue that the calculation of the allowable deductions under section 280A should be done property by property, i.e., once for only the condominium and once for only the house. This would require the Court to determine the rental income and expenses attributable to each of the properties. We will not make this argument on the IRS's behalf, *see Feigh*, 152 T.C. at 277, and we will therefore analyze the rental income and expenses for 2009 related to the Conrads' residences on an annual basis.

**[\*69]** § 280A(f)(1)(A) (a condominium and a house both qualify as dwelling units). The next question is whether the condominium was a residence of the Conrads for 2009. The condominium was used for personal purposes for the first half of the year, which was 181 days.[45] *See* § 280A(d)(1). This amount is greater than the greater of (1) 14 days or (2) 10% of the days during 2009 the condominium was rented at fair market value (with any day of personal use not counting as a day rented at fair market value). *See id.* Therefore, the condominium was used by the Conrads as a residence during 2009.

The house was used for personal purposes for the last half of 2009, which was 184 days. *See id.* This amount is greater than the greater of (1) 14 days or (2) 10% of the days during 2009 the house was rented at fair market value (with any day of personal use not counting as a day rented at fair market value). *Id.* Therefore, the house was used by the Conrads as a residence during 2009. Under section 280A(a), no deductions are allowed with respect to any use of the Conrads' residences for either the personal or rental portions, unless the deductions fall under exceptions provided in section 280A.

a.      *The Conrads' 2009 tax return*

The Conrads contend that they used both residences in their sole proprietorships. They filed Form 8829 on which Dr. Conrad claimed deductions purportedly related to his professional services. The format of the Form 8829 reflects the interpretation of the section 280A(c)(5) limitation by Proposed Treasury Regulation § 1.280A-2. In litigation Dr. Conrad still defends the tax treatment reflected on his 2009 Form 8829.

As with our discussion for 2008, we will first discuss how the Conrads calculated the deductions claimed on their return. For 2009 line 12 of Dr. Conrad's Form 8829 reported a $40,944 deduction for mortgage interest. Line 13 of the Form 8829 reported a $21,038 deduction for real estate taxes. These two lines totaled $61,982. Both mortgage interest and real estate taxes are deductible whether or not the residence is used

---

[45] For purposes of this Opinion, we assume that the Conrads moved out of the condominium on June 30, 2009, and into the house on July 1, 2009. There is not enough information in the record for us to draw a conclusion as to the exact dates. The record indicates only that the Conrads rented the house for six months in 2009, which fits our assumption that they moved into the house on July 1. Regardless of the exact dates, the Conrads' personal use of the condominium and the house is sufficient for both the condominium and the house to qualify as the Conrads' residences under section 280A(d).

**[\*70]** in the Conrads' sole proprietorships. *See* §§ 163(a), (h)(2)(D), 164(a)(1), 280A(b). These lines correspond to the first category of Proposed Treasury Regulation § 1.280A-2(*i*)(5), which is Proposed Treasury Regulation § 1.280A-2(*i*)(5)(i). The amounts are shown in the table above in the row titled "Dr. Conrad's deductions under Prop. Treas. Reg. § 1.280A-2(*i*)(5)(i)."

Dr. Conrad's Form 8829 also claimed deductions of $1,763 for insurance, $3,755 for utilities, and $30,906 for other expenses. These three deductions total $36,424 and were reported on line 23 of the Form 8829. In addition, line 24 of the Form 8829 reported $56,319 of operating-expense carryforwards from the Conrads' 2008 return. Lines 23 and 24 correspond to the second category of expenses in Proposed Treasury Regulation § 1.280A-2(*i*)(5), which is Proposed Treasury Regulation § 1.280A-2(*i*)(5)(ii). The amounts the Conrads reported on these two lines total $92,743 and are shown in the table above in the row titled "Dr. Conrad's deductions under Prop. Treas. Reg. § 1.280A-2(*i*)(5)(ii)."

Finally, Dr. Conrad's Form 8829 on line 29 reported $72,724 of depreciation for 2009 and on line 30 reported $387,391 of depreciation-and-excess-casualty-loss carryforwards from the Conrads' 2008 return. These two lines correspond to the third category of expenses in Proposed Treasury Regulation § 1.280A-2(*i*)(5), which is Proposed Treasury Regulation § 1.280A-2(*i*)(5)(iii). The amounts the Conrads reported on these two lines total $460,115 and are shown in the table above in the row titled "Dr. Conrad's deductions under Prop. Treas. Reg. § 1.280A-2(*i*)(5)(iii)."

In accordance with the ordering rules from Proposed Treasury Regulation § 1.280A-2(*i*)(5) (which the Form 8829 incorporates), the Conrads first deducted all their Proposed Treasury Regulation § 1.280A-2(*i*)(5)(i) expenses ($61,982) against Dr. Conrad's gross income from his professional services ($288,000). After doing so, the Conrads were left with $226,018 of income that could be offset with other deductions. The $226,018 was reported on line 15 of the Form 8829. The Conrads next deducted all their Proposed Treasury Regulation § 1.280A-2(*i*)(5)(ii) expenses ($92,743). After doing so, the Conrads were left with $133,275 of income that could be offset by further deductions. The $133,275 was reported on line 27 of the Form 8829. Finally, the Conrads used a portion of their Proposed Treasury Regulation § 1.280A-2(*i*)(5)(iii) expenses to offset the remaining $133,275 of Dr. Conrad's professional-services income (consisting of $72,724 of depreciation for 2009 and $60,551 of

[*71] depreciation and excess casualty loss expenses carried forward from 2008). After claiming this deduction, the Conrads carried forward $326,840 of Proposed Treasury Regulation § 1.280A-2(*i*)(5)(iii) expenses for use in future years. The $326,840 was reported on line 43 of the Form 8829.

Mrs. Conrad's Schedule C reported $81,267 of income from her accounting sole proprietorship, a $48,542 deduction purportedly for an "office expense," and a $43,200 deduction purportedly for "[r]ent or lease" of "[v]ehicles, machinery, and equipment." Dr. Conrad has conceded that these two expenses were actually for $48,542 of condominium fees and $43,200 of rent for the house. Both types of expenses therefore relate to the Conrads' residences and, had they been reported on the Form 8829, would have corresponded to the second category of business-use-of-home deductions, which are described by Proposed Treasury Regulation § 1.280A-2(*i*)(5)(ii). For convenience, the table lists the amounts as if they had been reported on Form 8829 as the second category of business-use-of-home deductions. Had they been so reported, the $91,742 of deductions would have been limited to $81,267. But because Mrs. Conrad did not use Form 8829 to report the $91,742, we have (contrary to the form) shown on the table in the row "Amount allowable" the allowed amount of $91,742. This reflects that Mrs. Conrad did not observe the $81,267 limit and deducted the full $91,742.

For 2009 the Conrads also reported the $104,333 of rental income they received from FMC. However, they did not report this rental income, or any deductions related to their residences, on their Schedule E. That is, they did not report that the expenses of the condominium and the house were allocable to their rental activities. In litigation Dr. Conrad again does not suggest that the expenses of the condominium and the house were allocable to the rental of the residences to FMC.

b.      *The notice of deficiency*

The notice of deficiency reflected the position that the residences were not exclusively used as Dr. Conrad's principal place of business and that therefore all the expense deductions related to the residences were disallowed by section 280A(a) and not exempted from the disallowance by section 280A(c)(1)(A). The notice of deficiency also implicitly disallowed the two types of carryforwards from 2008 reported by the Conrads on Dr. Conrad's Form 8829 because it did not incorporate an adjustment for their claimed carryforwards even though Dr. Conrad

**[\*72]** reported professional-services income during 2009 against which the carryforwards could be deducted. *See* § 280A(c)(5) (flush language).

The notice of deficiency disallowed the deductions claimed on Mrs. Conrad's Schedule C on the grounds that they are not ordinary and necessary expenses of Mrs. Conrad's accounting sole proprietorship, except that the notice of deficiency allowed a $3,885 deduction on Mrs. Conrad's Schedule C as a business-use-of-home deduction. The notice of deficiency did not explain how the IRS determined this to be the correct amount of allowable deductions.

The notice of deficiency did not disallow the $81,889 mortgage interest deduction or the $21,038 real estate tax deduction claimed as itemized deductions by the Conrads on their Schedule A.

<blockquote>c.    *The IRS's primary and alternative litigating positions*</blockquote>

As to Mrs. Conrad's Schedule C deduction for $48,542 of condominium fees, the IRS correctly observes that under the Supplemental Stipulation the actual amount paid was $24,271. We also note that the $24,271 relates to the entire condominium, a portion of which was used for personal purposes. As to Mrs. Conrad's Schedule C deduction for $43,200 of house rent, the IRS does not dispute that this was the amount of rent paid for the house for 2009. The IRS's brief challenged the deductibility of these expenses ($24,271 and $43,200) on the grounds that they were not "paid or incurred in connection with" Mrs. Conrad's "accounting business."

As to the $288,000 business-use-of-home deductions claimed on Dr. Conrad's Form 8829, the IRS's primary position is that these deductions are disallowed by section 280A(a) and not exempted by section 280A(c)(1). Under this primary position the $81,889 of mortgage interest paid by the Conrads on the condominium would be deductible only as an itemized deduction. The IRS's alternative position is that the $288,000 business-use-of-home deductions are limited by section 280A(c)(5) to the $104,333 in rents received by the Conrads from FMC for its use of the condominium and the house.

<blockquote>d.    *The Court's conclusion*</blockquote>

As column 6 in the table shows, we reject the Conrads' position. We do so because we conclude that the Conrads did not use their residences for their sole proprietorships during 2009. The Conrads

**[*73]** rented a portion of their residences to FMC which, in turn, allowed the Conrads to use areas that FMC controlled (as tenant) as offices. Thus, we conclude that the residence expenses are disallowed as business-use-of-home expenses under section 280A(c)(1) and Proposed Treasury Regulation § 1.280A-2 but are instead deductible as rental expenses under section 280A(c)(3) and Proposed Treasury Regulation § 1.280A-3. This means that the $104,333 of rental income paid by FMC to the Conrads is the correct ceiling for these deductions. *See* § 280A(c)(5); Prop. Treas. Reg. § 1.280A-3(d)(2). Therefore, we again agree with the IRS's alternative position on this issue, and we will use Proposed Treasury Regulation § 1.280A-3 to calculate the allowed deductions for 2009. Dr. Conrad does not dispute that this regulation should be used (in the event the house and the condominium are both found to be used by the Conrads as rental properties).

The notice of deficiency did not disallow any of the deductions for the residence expenses on the grounds that they were not paid or incurred. The IRS does not challenge any of the deductions the Conrads claimed for 2009 related to the condominium and the house on the grounds that the corresponding expenses were not paid, with the exception of the $48,542 deduction for condominium fees claimed on Mrs. Conrad's Schedule C. Therefore, we assume for purposes of this Opinion that the Conrads paid the following amounts: $81,889 of mortgage interest for the condominium for the first half of 2009; $42,076 of real estate taxes for the condominium for the first half of 2009; $3,526 of insurance expenses; $7,510 of utilities expenses; $61,812 of other expenses; condominium fees of $24,271, not the reported $48,542; and $43,200 for the rent for the house. At trial the IRS did not argue that these expenses were not paid or incurred. Therefore, we will use these amounts to calculate the Conrads' allowed deductions.

On Dr. Conrad's Form 8829 the Conrads divided the expenses related to the condominium and the house evenly between the portions of the residences used by FMC and the portions used by them personally.[46] The IRS has not argued that we should adjust this

---

[46] Thus, the Conrads deducted only one-half of the following expenses attributable to the condominium and the house on Dr. Conrad's Form 8829:

| Year | Type of expense | Amount of full expense | Amount of expense deducted |
|------|-----------------|------------------------|----------------------------|
| 2008 | Mortgage interest | $328,011 | $164,006 |

**[*74]** allocation method. Therefore, we will accept the Conrads' method and divide the residence expenses equally between their personal and rental activities. *See Feigh*, 152 T.C. at 277.

As we did for 2008, we place all of the Conrads' 2009 expenses into the three categories listed in Proposed Treasury Regulation § 1.280A-3. First, the Conrads claimed two deductions (mortgage interest and real estate taxes) that are deductible whether or not they rented portions of the residences to FMC. Half of each expense (i.e., one-half of $81,889 of mortgage interest and one-half of $42,076 of real estate taxes) is attributable to the rental portion of the Conrads' condominium, for a total of $61,983. *See* §§ 163(a), (h)(2)(D), 164(a)(1), 280A(b); Prop. Treas. Reg. § 1.280A-3(d)(3)(i). This category is shown in the table as "Deductions under Prop. Treas. Reg. § 1.280A-3(d)(3)(i)."[47]

The second category consists of so-called operating expenses, i.e., the other expenses related to the Conrads' residences (except for depreciation and casualty losses). *See* Prop. Treas. Reg. § 1.280A-3(d)(3)(ii). This category includes the current year expenses reported on Dr. Conrad's Form 8829 and Mrs. Conrad's Schedule C that are attributable to the Conrads' rental activities (utilities, insurance, other

| 2009 | Mortgage interest | 81,889 | 40,944 |
|------|-------------------|--------|--------|
| 2009 | Real estate taxes | 42,076 | 21,038 |
| 2009 | Insurance, utilities, other expenses | 72,848 | 36,424 |

The depreciation expenses also were calculated on the basis of half the residence being used for nonpersonal purposes.

However, the Conrads (improperly) deducted 100% of the following expenses attributable to the condominium and the house on Mrs. Conrad's Schedule C:

| Year | Type of expense | Amount of full expense | Amount of expense deducted |
|------|-----------------|------------------------|----------------------------|
| 2009 | Condominium fees | $48,542 | $48,542 |
| 2009 | Rent for house | 43,200 | 43,200 |

Note that the full expense for condominium fees was not $48,542 as reported, but $24,271. Thus, the proper allocation of condominium fees for the nonpersonal portion of the condominium using a 50/50 allocation would be $12,136.

[47] The other half of mortgage interest (i.e., $40,945) and the other half of real estate taxes (i.e., $21,038) are attributable to the portion of the Conrads' condominium used by the Conrads solely for personal purposes and are itemized deductions for 2009.

**[*75]** expenses, condominium fees for the condominium, and rent for the house), totaling $70,160.[48] In addition, we concluded *supra* OPINION, Part III.A.5, that the Conrads had $114,520 of operating-expense deductions to be carried forward to 2009. The Conrads thus have $184,680 of deductions that correspond to the second category of Proposed Treasury Regulation § 1.280A-3(d)(3). *See* Prop. Treas. Reg. § 1.280A-3(d)(3)(ii). This category is reflected in the final column of the table row titled "Deductions under Prop. Treas. Reg. § 1.280A-3(d)(3)(ii)."

The third category consists of the Conrads' depreciation and excess casualty loss expenses. The Conrads deducted $72,724 of depreciation for 2009. We also concluded *supra* OPINION, Part III.A.5, that the Conrads carry forward $387,391 of depreciation and excess casualty loss expenses from 2008. The Conrads thus have $460,115 of deductions that correspond to the third category of Proposed Treasury Regulation § 1.280A-3(d)(3). *See* Prop. Treas. Reg. § 1.280A-3(d)(3)(iii). This category is reflected in the final column of the table row titled "Deductions under Prop. Treas. Reg. § 1.280A-3(d)(3)(iii)."

The next step in the analysis is to apply the ordering rules found in Proposed Treasury Regulation § 1.280A-3(d)(3). FMC paid the Conrads $104,333 of rental income in 2009. This represents the ceiling of allowed deductions. *See* § 280A(c)(5); Prop. Treas. Reg. § 1.280A-3(d)(2). We first allow the Conrads to deduct all their Proposed Treasury Regulation § 1.280A-3(d)(3)(i) expenses ($61,983). The Conrads earned more rental income than they have allowable deductions from this category, so they can fully deduct this category of expenses for 2009. *See* Prop. Treas. Reg. § 1.280A-3(d)(3)(i). After doing so, they still have room under the gross-income limitation to deduct $42,350 of additional expenses (i.e., $104,333 minus $61,983).

The next category of deductions to consider under Proposed Treasury Regulation § 1.280A-3(d)(3) is the second category of deductions. Prop. Treas. Reg. § 1.280A-3(d)(3)(ii). This category includes $184,680 of deductions. However, since only $42,350 of rental income remains to offset by deductions, only $42,350 of expenses from the second category may be deducted for 2009. *See id.* The remaining deductions in the category ($142,330) are carried forward to 2010. *See*

---

[48] The other half of these expenses (i.e., $70,160) is related to the portions of the residences used by the Conrads solely for personal purposes and is therefore nondeductible under section 262(a).

**[*76]** § 280A(c)(5) (flush language); Prop. Treas. Reg. § 1.280A-3(d)(3)(ii). This carryforward is reflected in the last column of the table row titled "Disallowed Prop. Treas. Reg. § 1.280A-3(d)(3)(ii) deductions (carryover to 2010)."

Because the maximum deduction for the residences for 2009 is completely absorbed by the first and second categories, the Conrads must carry forward to 2010 all $460,115 of deductions for their depreciation and excess casualty loss expenses. *See* § 280A(c)(5); Prop. Treas. Reg. § 1.280A-3(d)(3)(iii). This carryforward is reflected in the last column of the table row titled "Disallowed Prop. Treas. Reg. § 1.280A-3(d)(3)(iii) deductions (carryover to 2010)."

The final step in our analysis is to determine whether any other provision of section 280A further limits the Conrads' deductions. Deductions allowed under section 280A(c)(3) are subject to limitation by section 280A(c)(6); however, for the reasons discussed *supra* OPINION, Part III.A.5, we conclude that the IRS has waived any argument that the Conrads' deductions are limited by section 280A(c)(6).

A taxpayer who has expenses attributable to renting out a residence may find the deductions attributable to such expenses limited by section 280A(e)(1). The IRS does not suggest that this provision limits the deductions for the expenses attributable to the Conrads' rental of the condominium and the house to FMC. We therefore need not address this potential argument. *See Feigh*, 152 T.C. at 277.

We hold that in total there is a deduction of (1) $61,983 of mortgage interest and real estate taxes as itemized deductions on the Conrads' Schedule A and (2) $104,333 of the expenses related to the rental use of the Conrads' residences in 2009 as above-the-line deductions.[49] There is a carryforward of (1) $142,330 of operating

---

[49] On their 2009 return the Conrads deducted their residence expenses against their professional-services incomes. In our view, the residence expenses are not the expenses of either sole proprietorship but rather are the expenses of rent-producing property. This raises the question of how much of these residence expenses should be deducted in calculating the Conrads' self-employment tax liabilities.

Dr. Conrad's self-employment income is calculated without any deductions for the expenses of the residences. As to Mrs. Conrad, however, there is a procedural issue resulting from the determination of the notice of deficiency that there should be a $3,885 deduction against her sole-proprietorship income for business use of home. The IRS has not disavowed this allowance nor argued for an increased deficiency. *See*

[*77] expenses and (2) $460,115 of depreciation and excess casualty loss expenses to 2010.

IV. *The interest deduction claimed on Mrs. Conrad's 2009 Schedule C is deductible for FMC, not Mrs. Conrad.*

For 2009 Mrs. Conrad claimed a $7,582 deduction on her Schedule C for interest payments related to FMC's yacht. The notice of deficiency disallowed this deduction. In its opening brief, the IRS contends that the interest expense is not deductible against Mrs. Conrad's sole-proprietorship income under section 162(a) because it was not "paid or incurred in connection with the operation of her . . . accounting business." The Conrads originally deducted the yacht interest on Mrs. Conrad's Schedule C. However, Dr. Conrad has conceded in his brief that the Conrads cannot deduct the interest as an expense of Mrs. Conrad's accounting sole proprietorship.

We have held *supra* OPINION, Part II.B, that since FMC's yacht was not an entertainment facility during the years at issue, section 274(a)(1)(B) does not disallow FMC's nondepreciation deductions with respect to its yacht. Furthermore, the fact that the interest expense was not an expense of Mrs. Conrad's accounting business does not preclude the interest expense from being a business expense of FMC. Indeed, the yacht was bought by FMC for its business, and it was a corporate asset. We will therefore determine whether the yacht interest is a deductible expense of FMC.

Section 163(a) allows a taxpayer to deduct all interest paid or accrued within the taxable year on indebtedness. As an accrual method taxpayer, FMC has a deduction for the interest expense if (1) it was legally liable for the corresponding debt related to the yacht and (2) the interest expense accrued during 2009. *See Hynes v. Commissioner*, 74 T.C. 1266, 1287 (1980) ("It has long been established that for interest to be deductible under section 163(a), the interest must be on the

---

§ 6214(a); *Estate of Petschek v. Commissioner*, 81 T.C. 260, 271–72 (1983), *aff'd*, 738 F.2d 67 (2d Cir. 1984); *Koufman v. Commissioner*, 69 T.C. 473, 475–76 (1977). We thus hold the IRS to its notice of deficiency position even though it is inconsistent with our view that the residence expenses were not the expenses of Mrs. Conrad's sole proprietorship. Therefore, we will allow Mrs. Conrad to deduct $3,885 of the residence expenses against her self-employment income. The remaining $100,448 of the rental-expense deductions are not deducted against either of the Conrads' professional-services incomes. Both the $3,885 business-use-of-home deduction on Mrs. Conrad's Schedule C and the $100,448 of deductions for the Conrads' rental expenses are above-the-line deductions. *See* § 62(a)(1), (4).

[*78] taxpayer's own indebtedness and not on the indebtedness of another."); *Casalina Corp. v. Commissioner*, 60 T.C. 694, 705 (1973) ("Interest accrues during the taxable year on a fixed and unconditional obligation, and it is deductible as it accrues and not when it is paid if the taxpayer is on the accrual basis."), *aff'd per curiam*, 511 F.2d 1162 (4th Cir. 1975).

Paragraph 28 of the Supplemental Stipulation establishes that an interest expense of $7,582 was paid and that it was related to FMC's yacht. Although this paragraph does not specify who the borrower on the yacht loan was, it is more likely than not that FMC, as the yacht's owner, was the borrower. It follows that FMC was liable to make the $7,582 interest payment. Although the paragraph does not specify when the interest expense accrued, it is more likely than not that it accrued when it was paid, during 2009.[50]

Because we conclude that FMC was the borrower on the corresponding loan related to its yacht and that the interest expense accrued in 2009, FMC is permitted to deduct $7,582 of interest related to its yacht in 2009. As 51.25% owners of FMC, the Conrads are entitled to include their share of that interest, which amounts to $3,886, as part of their deduction for passthrough losses from FMC on their 2009 Schedule E.[51]

V. *The Conrads' liability for section 6662 accuracy-related penalties for the years at issue*

Finally, we consider whether the Conrads are liable for section 6662(a) accuracy-related penalties for the years at issue. Section 6662(a) imposes a penalty of 20% on the portion of an underpayment of tax that is attributable to (1) negligence or disregard of the Code or the regulations, (2) a substantial understatement of income tax, or (3) a

_____

[50] Because we find that FMC was liable on the debt and that the debt accrued during 2009, we need not determine whether FMC made the interest payment. If one or both of the Conrads paid the interest expense on behalf of FMC, the result would be either a loan or a contribution of capital by the Conrads to FMC. *See Rink v. Commissioner*, 51 T.C. 746, 751 (1969). A contribution of capital would increase the payor's corresponding basis in his or her ownership share of FMC. Neither party contends that the Conrads made a loan or a contribution of capital to FMC. Thus, we will not address any basis adjustment here.

[51] Because the $7,582 of interest expense is not an expense of Mrs. Conrad's sole proprietorship, and thus should not have been claimed as a deduction on her Schedule C, her self-employment income for 2009 was underreported by $7,582.

**[\*79]** substantial valuation misstatement. § 6662(b)(1), (2), and (3). The notice of deficiency determined that the Conrads are liable for section 6662 penalties on the grounds that their underpayments of tax for the years at issue are attributable to (1) negligence and disregard of the Code and regulations, (2) substantial understatements of income tax, or (3) substantial valuation misstatements. That the underpayments were attributable to substantial valuation misstatements was a position abandoned by the IRS on brief. Therefore, we decline to consider it. *See Amazon.com, Inc.*, 148 T.C. at 220.

A substantial understatement of income tax exists "if the amount of the understatement for the taxable year exceeds the greater of . . . 10% of the tax required to be shown on the return for the taxable year, or . . . $5,000." § 6662(d)(1). Thus, there is a substantial understatement if (i) the amount of the understatement is greater than 10% of the tax required to be shown on the return and (ii) the 10% amount is greater than $5,000. An understatement is the "amount of the tax required to be shown on the return for the taxable year" minus "the amount of the tax imposed which is shown on the return." § 6662(d)(2)(A).

Section 6662(d)(2)(B) provides that the amount of the understatement is reduced by the portion attributable to (1) the tax treatment of any item by the taxpayer for which there is or was substantial authority or (2) an item for which (a) the facts affecting the item's tax treatment are disclosed on the return and (b) there is a reasonable basis for the tax treatment of the item by the taxpayer. The Conrads do not argue there should be a reduction under section 6662(d)(2)(B), and we therefore need not consider it here. *See Feigh*, 152 T.C. at 277.

The section 6662(a) penalty is not imposed with respect to any portion of an underpayment if it is shown that there was a reasonable cause for that portion and that the taxpayer acted in good faith with respect to that portion. § 6664(c)(1). This exception is sometimes referred to as a "defense." The relevant regulations provide that "whether a taxpayer acted with reasonable cause and in good faith is [determined] on a case-by-case basis, taking into account all pertinent facts and circumstances." Treas. Reg. § 1.6664-4(b)(1). "Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." *Id.* "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and

**[\*80]** circumstances, including the experience, knowledge, and education of the taxpayer." *Id.*

Section 6751(b)(1) provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher-level official as the Secretary may designate." This Court has held that the person making the initial determination to impose the penalty must obtain written supervisory approval for penalties before the first formal communication of penalties to the taxpayer. *Clay v. Commissioner*, 152 T.C. 223, 249 (2019), *aff'd*, 990 F.3d 1296 (11th Cir. 2021).[52]

### A. *The IRS bears the burden of production, and Dr. Conrad bears the burden of persuasion.*

The burden of proof consists of two components: the burden of production and the burden of persuasion. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005). Taxpayers generally bear the burdens of production and persuasion, *see* Rule 142(a)(1), but the IRS bears the burden of production with respect to an individual taxpayer's liability for penalties, § 7491(c). To satisfy this burden, the IRS "must present sufficient evidence to show that it is appropriate to impose the penalty in the absence of available defenses." *Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016); *Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). As part of its

---

[52] We note that several circuits apply a different test for determining whether the IRS satisfies section 6751(b)(1). *See Minemyer v. Commissioner*, No. 21-9006, 2023 WL 314832, at \*5 (10th Cir. Jan. 19, 2023) ("[T]he requirements of [section] 6751(b)(1) are met so long as written supervisory approval of an initial determination of an assessment is obtained on or before the date the IRS issues a notice of deficiency."), *aff'g in part, rev'g in part and remanding* T.C. Memo. 2020-99; *Kroner v. Commissioner*, 48 F.4th 1272, 1276, 1279 n.1 (11th Cir. 2022) (stating that "the IRS satisfies Section 6751(b) so long as a supervisor approves an initial determination of a penalty assessment before it assesses those penalties" but leaving unaddressed whether a timing requirement arises from the statute's use of the word "approve" because a supervisor cannot "approve" something after losing the discretion to approve it), *rev'g in part* T.C. Memo. 2020-73; *Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1071, 1074 (9th Cir. 2022) (stating that the IRS satisfies section 6751(b)(1) for "assessable penalties" (which are not subject to deficiency procedures) if the supervisor's approval is secured before the IRS assesses the penalty or "before the relevant supervisor loses discretion whether to approve the penalty assessment"), *rev'g and remanding* 154 T.C. 68 (2020). The D.C. Circuit, the court to which an appeal of this case would presumably lie, *see supra* note 3, has not squarely addressed the proper test under section 6751(b)(1). Therefore, we will apply our precedent on this issue.

**[\*81]** burden of production, the IRS must produce evidence that it complied with the requirements of section 6751(b)(1). *Graev,* 149 T.C. at 492–93.

As part of their burden of persuasion, taxpayers must prove they had reasonable cause for and acted in good faith with respect to the relevant portion of the underpayment. *See Higbee,* 116 T.C. at 446–47.

B. *The requirements of section 6751(b)(1) are met for a substantial understatement but not for negligence.*

We hold that there was supervisory approval for penalties for substantial understatements but not for negligence.

1. *Substantial Understatement*

The Civil Penalty Approval Form was completed by Finney on April 12, 2011. On the first page of the Civil Penalty Approval Form a blank box underneath the heading is labeled "Reason(s) for Assertion of Penalty(s) IRM 4.10.6.7(1)." Finney wrote, in part, in the blank box: "The understatement of the tax is greater than $5,000.00." The second page contained a table asking Finney to mark "Yes" or "No" for various penalties identified by preprinted descriptions in the "Penalty" column and by preprinted Code sections in the "IRC" column. Finney marked "Yes" for the penalty identified as "Substantial Understatement" in the "Penalty" column and "6662(d)" in the "IRC" column. From this we conclude that Finney determined that the Conrads were liable for a penalty for a substantial understatement for each year at issue.

The Civil Penalty Approval Form was signed by Marlow on July 18, 2011, nearly a year and a half before the notice of deficiency was issued to the Conrads on January 8, 2013. Marlow credibly testified that she was Finney's group manager while Finney conducted his review of the Conrads' 2008 and 2009 returns. We conclude that Marlow was Finney's immediate supervisor when he completed the Civil Penalty Approval Form and when Marlow signed it. Marlow credibly testified that she sent the Conrads an "initial report" with the Civil Penalty Approval Form attached. Although this "initial report" is not in the record, her use of the words "initial report" indicates that the report was the first formal communication with the Conrads about penalties. Because the signed Civil Penalty Approval Form was attached to the report, this communication must have been made on or after July 18, 2011.

**[*82]** Dr. Conrad has not claimed that the IRS formally communicated its initial penalty determination to the Conrads before July 18, 2011, nor does the record support such a claim. *See Frost v. Commissioner*, 154 T.C. 23, 34 (2020) (stating that once we conclude that "[the IRS's] evidence [shows] that a penalty was approved before a formal communication of the penalty to [the taxpayer,] . . . the burden shifts to [the taxpayer] to introduce contrary evidence"). Accordingly, we find that Marlow's approval of penalties for substantial understatements occurred before the Conrads received formal communication about the penalty. We thus hold that the IRS complied with the requirements of section 6751(b)(1) for penalties for substantial understatements. *See Clay*, 152 T.C. at 249.

Our findings supporting this holding are made on a preponderance of evidence. A fortiori the IRS has met its burden of production. A fortiori Dr. Conrad has not met his burden of persuasion.

### 2. *Negligence*

On the first page of the Civil Penalty Approval Form, Finney wrote, in part, that "[t]axpayers failed to exercise ordinary and necessary care in the preparation of the return." This sentence might be read to suggest that he determined penalties for underpayments due to negligence. *See* Treas. Reg. § 1.6662-3(b)(1) (defining negligence to include any failure to exercise ordinary and reasonable care in the preparation of a tax return). However, on the second page of the Civil Penalty Approval Form, Finney marked the "No" box in the "Assert Penalty" column for the penalty identified as "Negligence" in the "Penalty" column and "6662(c)" in the "IRC" column.

We find Finney's responses on the second page of the Civil Penalty Approval Form dispositive of which penalties he initially determined. The second page of the Civil Penalty Approval Form asked Finney to select penalties to be imposed as identified by Code section in the "IRC" column. He chose to mark "No" for the penalty for negligence under section 6662(c). By contrast, Finney's response on the first page of the Civil Penalty Approval Form is a narrative description of his reasons for imposing the penalty. These comments on the first page of the form do not correspond to the text of the respective Code provisions imposing the penalty components, and he does not reference any Code sections on the first page of the form. Because Finney's response on the second page of the Civil Penalty Approval Form referenced specific Code sections as well as the text of the Code sections (i.e., "negligence"), we

**[\*83]** find that Finney did not make an initial determination to assess penalties against the Conrads for underpayments due to negligence. *See Belair Woods, LLC v. Commissioner*, 154 T.C. 1, 5–6 (2020) (concluding supervisory approval was given only for the three penalty components that were checked "Yes" on the Civil Penalty Approval Form); *Estate of Ronning v. Commissioner*, T.C. Memo. 2019-38, at \*12–13, \*45–46 (concluding that supervisory approval was not given for a penalty for substantial understatement when the Civil Penalty Approval Form had been checked "Yes" for negligence and "No" for the other penalties listed on the form), *aff'd*, 830 F. App'x 279 (11th Cir. 2020). It follows that Marlow's signature on the Civil Penalty Approval Form did not approve a determination that the Conrads were liable for a penalty for negligence.

On or after July 18, 2011, the IRS mailed the Conrads an "initial report" (which is not in the record) that was accompanied by the Civil Penalty Approval Form. On January 8, 2013, the IRS mailed a notice of deficiency to the Conrads stating that their underpayments for 2008 and 2009 were due to substantial understatements of income tax, substantial valuation misstatements, or negligence. The IRS does not argue that either the "initial report" or the notice of deficiency represented an approval (initial or otherwise) of the imposition of the negligence components of the accuracy-related penalties. Instead, the IRS contends that it was the Civil Penalty Approval Form that represented the initial determination (by Finney) and approval (by Marlow) of the negligence components of the accuracy-related penalties.

Recall that the notice of deficiency named Tate as the person to contact and was signed by (Appeals Team Manager) Redstone. We surmise that Tate and Redstone were employees of the IRS Appeals Division. One might speculate that Redstone or Tate or someone else at Appeals might have initially determined that the Conrads were liable for the negligence component. But it is more likely that Appeals (like IRS counsel in this litigation) believed that Finney and Marlow had already initially determined and approved the negligence components by way of the Civil Penalty Approval Form.

We hold that the supervisory-approval requirement of section 6751(b)(1) was not met for the negligence components. Our findings underlying this holding are made on a preponderance of evidence. A fortiori the IRS has not met its burden of production. Dr. Conrad would have met his burden of persuasion.

**[\*84]** C.    *The Conrads are liable for penalties for substantial understatements if the parties' Rule 155 computations show that the Conrads substantially understated their tax liabilities for 2008 and 2009 (but no penalty is imposed on the portions of the underpayments attributable to the deductions claimed for depreciation of the yacht and the airplane because these portions are attributable to reasonable cause and good faith).*

We must next determine whether the Conrads are liable for penalties for substantial understatements of income tax. The amounts of the understatements will depend on the computations of the Conrads' 2008 and 2009 tax liabilities considering (1) the Stipulation of Facts, (2) the Supplemental Stipulation, and (3) the holdings reached in this Opinion. In this Opinion, we have denied deductions for (1) depreciation of FMC's yacht, (2) depreciation of FMC's airplane, and (3) interest expenses related to FMC's yacht on Mrs. Conrad's 2009 Schedule C. However, we have allowed deductions from the Conrads' gross income for (1) an amount equal to their passthrough share of FMC's deductions for storage, maintenance, and upkeep expenses with respect to its yacht, (2) an amount equal to their passthrough share of FMC's deductions for storage, maintenance, and upkeep expenses and Dr. Conrad's flying lessons with respect to its airplane, (3) expenses related to the rental use of their homes, including a portion of those originally reported on the Schedule C for Mrs. Conrad's accounting business, within the limit allowed under section 280A(c)(5), and (4) an amount equal to their passthrough share of FMC's deduction for interest expense related to its yacht. The parties' stipulations and our holdings, therefore, necessitate computations to determine the amounts of tax imposed for the years at issue, which we leave to the parties under Rule 155. The IRS will have met its burden of production if the Rule 155 computations show that the Conrads had substantial understatements of income tax for 2008 and 2009.

Finally, we must consider whether the Conrads have proven that they had reasonable cause and that they acted in good faith for any portion of their underpayments. We concluded that FMC attempted to use the airplane in its business, that it earned some revenue from renting the airplane to third parties, and that the nondepreciation expenses related to the airplane were deductible. However, we also concluded that FMC could not deduct any depreciation related to the airplane because it failed to place the airplane in service for its specifically assigned function. Although we ruled against the Conrads

**[\*85]** on the airplane depreciation issue, we believe that a reasonable taxpayer in FMC's and the Conrads' positions could struggle to understand that trying to use the airplane in FMC's business while also renting the airplane to third parties did not constitute placing the airplane in service for its specifically assigned function. We conclude that FMC's and the Conrads' error on this issue qualifies as "an honest misunderstanding of . . . law." Treas. Reg. § 1.6664-4(b)(1). Therefore, we hold that the Conrads have reasonable cause for and acted in good faith with respect to the portions of the underpayments attributable to FMC's depreciation deductions for its airplane.

We also conclude that the Conrads had reasonable cause and acted in good faith relating to FMC's yacht depreciation deductions. Although Dr. Conrad conceded the depreciation deductions in his brief, we allowed FMC to deduct the nondepreciation expenses with respect to the yacht. Furthermore, Dr. Conrad credibly testified that he believed FMC could deduct the depreciation because (1) the yacht was a business asset of FMC when it was used for the 2003 trip and (2) FMC had tried, but failed, to find a purchaser for the yacht. We conclude that there was "an honest misunderstanding of . . . law." Treas. Reg. § 1.6664-4(b)(1). Therefore, we hold that the Conrads had reasonable cause for and acted in good faith with respect to the portions of the underpayments attributable to FMC's depreciation deductions for its yacht.

However, we conclude that the Conrads failed to prove that they had reasonable cause and failed to show they acted in good faith for all the other portions of the underpayments for 2008 and 2009. As to the Conrads' reporting of the residence deductions, which the Conrads did not concede, we observe several indicators of bad faith on the Conrads' part. First, the Conrads overreported their mortgage interest expenses by $52,551 for 2008 and $40,944 for 2009. Second, the Conrads reported $48,542 of condominium fees for 2009 when in fact they paid only $24,271. Lastly, the Conrads attempted to conceal the true nature of the expenses by reporting deductions on Dr. Conrad's Schedule C and Mrs. Conrad's Schedule C. The portions of the underpayments related to the residence deductions were not due to reasonable cause or good faith.

As explained *supra* note 4, the Conrads conceded several issues before trial. One concession was for an IRA distribution for Dr. Conrad during 2008. Dr. Conrad testified that he failed to report this distribution because of a "mistake" in his understanding of the law. However, Dr. Conrad did not argue in his brief that he had reasonable cause for failing to report his IRA distribution. We thus conclude that

**[\*86]** he has waived this argument. *See Amazon.com, Inc.*, 148 T.C. at 220. Dr. Conrad does not argue that he had reasonable cause for the other issues for which he made pre-trial concessions. We therefore conclude that the Conrads did not prove that they had reasonable cause or that they acted in good faith in regard to the portions of their underpayments related to the issues that they conceded before trial.

Taking into consideration all the facts and circumstances, we hold that the Conrads have not shown that they had reasonable cause or that they acted in good faith except for the portions of the underpayments attributable to FMC's deductions for depreciation of its airplane and its yacht. Therefore, if revised computations under Rule 155 show substantial understatements of income tax because of the understatements caused by the residence expenses and the yacht interest deducted by the Conrads and the unreported income they conceded before trial, the Conrads are liable for accuracy-related penalties under section 6662(a) for the tax years at issue.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155 with respect to Thomas D. Conrad, and an appropriate order and decision will be entered with respect to Margaret Joan Conrad.*